# THE SUPREME COURT

OF

## PENNSYLVANIA.

72 471
154 304

### EASTERN DISTRICT—PHILADELPHIA, 1873.

## Scott & Brother *versus* The National Bank of Chester Valley.*

1. A mere depositary without special contract or reward, is liable for the loss of the deposit only in case of gross negligence, which is equivalent to fraud.

2. The degree of care required of such depositary is that which he bestows on his own goods.

3. A bank which was such depositary and exercising that degree of care is not liable for a larceny of the deposit, even by its own officers.

4. From such special deposit with a bank of money in packages no consideration can be implied.

5. A bank received bonds on special deposit for safety from one of its customers and at his risk, and placed them in a safe with similar deposits from others, and its own securities. The bonds were stolen by a teller. The theft by the teller was not connected with his employment and there was no liability on the bank unless they knew or had reason to suspect he was not trustworthy.

6. The teller absconded and it was then discovered that his accounts were false and that he had robbed the bank during two years. *Held*, that the bank was not bound to examine the teller's accounts for the benefit of a depositor who was a gratuitous bailee.

7. Negligence as a ground of liability must be such as enters into the cause of loss.

8. Purchase and sale of stocks by an officer of a bank is not *ipso facto* evidence of dishonesty, but if such officer be found engaged in stock-gambling or buying and selling beyond his means, he should not be continued in a place of trust.

---

* This case being thought of peculiar interest, it is inserted in anticipation of its chronological order.

[Scott *v.* National Bank of Chester Valley.]

January 21st 1874.    Before AGNEW, C. J., MERCUR and
GORDON, JJ.    SHARSWOOD, J., at Nisi Prius.

Error to the Court of Common Pleas of *Chester county :* Of
January Term 1874, No. 193.

This was an action on the case brought October 14th 1872, by
John Scott, Jr., and Amos Scott, trading as Scott & Brother,
against the National Bank of Chester Valley to recover the value
of four government bonds, each of $1000, which had been placed
by the plaintiffs with the bank for safe-keeping, and which
had been stolen by John S. Martin, a clerk or teller of the bank.

The bank was located in Coatesville ; the plaintiffs were store-
keepers in the neighborhood and had kept an account with the
bank from its organization, many years before.    They were in the
habit of depositing their government bonds and other securities
with the bank for safe-keeping.    Prior to October 1st 1872, they
had deposited with the bank, bonds to the amount of $7000, which
were contained in an envelope, and placed in a safe in the vault of
the bank.    On that day, or the day before, Martin absconded,
being in default to the bank to the extent of about $26,000.    On
the 3d of October, one of the plaintiffs came to the bank and
asked for their envelope, and upon examination it was discovered
that four bonds of $1000 each were missing; it was afterwards
ascertained that they had been stolen by Martin.

Mr. Davis, the cashier of the bank, testified that when the
bank had originally received for safe-keeping the securities of
persons desiring to deposit them in bank, each depositor placed his
securities in his own box, and the boxes were placed in a large
vault in the back part of the banking-room, behind the counter ;
that subsequently, the bank having been advised that unless they
kept these securities as they did their own, they would be liable in
case of loss, they procured a burglar safe, which they put inside
of their vault.    The boxes took too much space to be contained
in the safe, and the bank proposed to these depositors, that if
they were willing to put their securities into envelopes and
have them thus placed in the safe, they might deposit them
there.

The depositors, amongst others the plaintiffs, acceded to this.
The envelopes were numbered, and a check or card given by. the
bank to the depositor.    The check read : "Scott & Brother left
with the bank a package containing valuable securities, said de-
positor assuming all risk from robbery or otherwise, said package
to be delivered only to the depositor in person or on his written
order, and surrender of this ticket."    The plaintiffs gave to the
bank a written direction to have the coupons cut off the bonds as
they became due, and credited to their account with the bank.    It
had been regularly so done ; the last coupons were cut off on the
1st of July 1872; the cashier had not seen the bonds after that

day; nor had he known of their loss till the 3d of October, when the plaintiffs came for them after Martin had absconded; nor was his defalcation known or suspected till then.

The securities of depositors were kept with the same care and in the same manner as the securities and bank-notes of the bank, and the individual securities of the president and cashier. The packages were delivered to the depositor by whatsoever officer of the bank was asked for them; all the officers of the bank had access to the vault and the safe; the bank kept no record of the securities. All the other envelopes were examined and found correct.

Martin entered the employ of the bank about April 1st 1867. Witness had known Martin from childhood; he had a high reputation for integrity; never heard of anything wrong about him till he absconded; was the best officer the bank ever had. As afterwards discovered the first money Martin took from the bank was in July 1870.

Mr. Gibbons, the president of the bank, testified much as the cashier: he also said that by opening a letter to Martin by mistake, witness and cashier ascertained early in 1871 that Martin had been dealing in stocks through Gilbough, Bond & Co., brokers in Philadelphia; Gilbough had formerly been a clerk in the bank; the witness went to Philadelphia to see Gilbough; they told witness that Martin had dealt to small amounts; they promised that if Martin again speculated they would advise witness; witness considered from that, that he had taken such measures as would secure the bank from any further speculations; nothing was said to Martin on the subject. Witness saw Martin's account three times a week, assisted him in counting up his cash, adding his figures, &c., looked over his books, &c. When witness learned that the bonds had been taken, he visited Gilbough, Bond & Co., having been informed that they had received them and demanded the bonds from them; they said they kept no numbers and were not liable for coupon bonds which passed by handing over. The bank had Martin pursued and arrested; he was convicted and sentenced for the larceny of these bonds.

At the time Martin absconded, and for some time previously, his salary was $800; it had been lower when he first entered the bank, and had been gradually increased. He was a young man, but was married; his mode of living did not appear to be beyond his means; his habits inexpensive and nothing about them to excite suspicion. He had the confidence of the whole community, was treasurer of the Coatesville Gas Company, and of a church of which he was a member; and had been a receiver of the payments for the stock of a railroad company which had gone into operation not a great while before. In all these capacities he had been faithful.

[Scott *v.* National Bank of Chester Valley.]

A number of witnesses, residents of the neighborhood, testified that Martin had always borne a good character.

He had continued in his stock speculations, but Gilbough, Bond & Co. never informed the officers of the bank; nor did the officers make further inquiry about it.

The accounts of Martin were examined slightly, his cash accounts always right according to the books; he had been acting as receiving-teller at the time he absconded.

Mr. Adams, the National Bank examiner, who had been called in to examine Martin's accounts, testified:—

"Davis has as much as he can do to get through with; might have added up the columns every day; take two hours of every day; could only discover the false entries on note and discount book; the work would require considerable time; have to be watched all day long; take two or three hours daily; have to be done after the close of business; not usually done, unless grounds of suspicion; this bank conducted as well as any in Eastern Pennsylvania; not customary to go over work in that way; usual affairs settled in one-half hour; have to carry on his correspondence after bank hours; dividend six per cent., half-yearly; much of the defalcations were in false additions; the only cause of complaint was because he was allowed to keep his ledger, which was a check on his work; apart from that the bank is run in *tiptop* style."

The plaintiffs' points were:—

1. If the jury find the defendant was a bailee for compensation, and that one of the officers of the bank stole and disposed of the property deposited, the plaintiff is entitled to recover.

2. Even if the jury find the defendant was a bailee without compensation, and that one of the officers of the bank stole and disposed of the property, the plaintiff is entitled to recover.

3. If the jury believe that there was want of ordinary care on the part of the defendant, or any of its officers, in keeping the bonds, or in retaining John L. Martin, the defaulter, in their employ after the fact that he was dealing in stocks was known, or in allowing him to keep the only book that was a check upon his operations, or in not sufficiently scrutinizing his accounts, the plaintiff is entitled to recover.

The answers were:—

"1. The law would be so if the defendant was a bailee for a consideration; but in this case there is no proof of any consideration whatever.

"2. This is not the law, provided the depositee (the bank) used ordinary care and prudence in the selection of their officers. Nothing but gross negligence on the part of the bank in making the selection will render it liable to the plaintiffs.

"3. The default of the bank officers, in not looking over the accounts, cannot be taken advantage of by the plaintiffs. They

[Scott *v.* National Bank of Chester Valley.]

were not defrauded by his account-books, but it is a case of direct larceny of their bonds."

The court (Pearson, P. J., of the 12th district), after giving a synopsis of the facts charged :—

* * * "This is what we consider an outline of the facts; they are for the determination of the jury, who must pass on the evidence, and from that fill up the details. On this statement we must declare the law, which you must apply to the facts as you find them. [These bonds were delivered to the officers of the bank as mere depositees, without any benefit to the depositee, so far as has been proved, and for the convenience of the plaintiffs, and the bank was bound to no greater care of the deposit than a person of ordinary care and prudence generally takes of his own goods of equal value.]

"The depositee is responsible only for gross negligence; whether there was or was not gross negligence in this particular case is a question of fact for the jury.

"It is, perhaps, pretty clear that the defendants' officers took the same care of the plaintiffs' bonds that they did of the money of the bank, and of their own private bonds and property; both were deposited in the same place, and left under the control of the same clerks or agents.

"These bonds were not taken by outside force, but were abstracted by one of the bank clerks; carried off feloniously by him. Was he a man who, from his known character, would be intrusted in a bank by persons of ordinary prudence?

"You have heard the statement of numerous witnesses as to the general character of this young man; all speak of him in the highest terms. He appears to have had the confidence of the entire community, as well as that of the bank officers; stood well in church and state; was made the treasurer of one of the churches, and of the Gas Company; nothing was known or said against him, so far as we can gather from the witnesses. Was it gross carelessness to trust him?

"It is said, however, that more than a year before his delinquency became public, the cashier and president both knew that he had been dealing in stocks, and this, in itself, should have put those officers on their guard. You have heard the statement of both of those gentlemen, and, from that, it appears that when they accidentally discovered that he had so dealt on one occasion, they at once inquired of the broker in Philadelphia, with whom he dealt, and were informed that he had made one small purchase— had done well in it, and the broker, in whom the officers had confidence, promised that if he dealt further they should be informed.

"They never heard of any other dealing until the clerk had greatly defrauded the bank, committed the larceny of these bonds,

[Scott *v.* National Bank of Chester Valley.]

and had absconded. Were the officers guilty of imprudence in retaining the clerk under the circumstances?

" Is a single purchase and sale of stock such evidence of moral delinquency as would call for the immediate discharge of a valuable clerk of good general character? It strikes us that it would be judging harshly of an act done daily in the cities, and business followed by men generally esteemed respectable. Had he been found at the gaming-table, or engaged in some fraudulent or dishonest practices, he should not be continued in a place of trust.

" These officers seemed to have acted with reasonable care and prudence in taking the steps they did to prevent a repetition of that kind of speculation.

" It is contended that the officers were careless in not examining more frequently Martin's accounts, and had they looked into them with more vigilance and skill they would have detected his delinquencies and discovered his dishonesty. It is very clear, if you believe those officers, that they never did make any such discovery, had no suspicion that anything was wrong, and, therefore, continued to trust him with all of the property of the bank. [They were not bound to search into his accounts for the benefit of a gratuitous bailor, and his loss did not arise out of any account kept by the clerk, but from a transaction outside of his employment.]

" If a man should ask a merchant to keep a package of money over night, for the accommodation of the depositor, and the desk should be opened and the money stolen by the merchant's clerk, could it be successfully urged that it might have been discovered that the clerk was dishonest, and had stolen his master's goods, if the merchant had watched with sufficient vigilance? It would certainly be a good answer for the merchant to say, I never did discover the clerk's dishonesty, I trusted him with my own money, and was not bound to seek out his delinquencies for the sake of a gratuitous bailor.

" [It is assumed, that if the bonds were stolen by defendant's clerk, it is liable whether his propensity to steal was known or not, and without regard to his general character. We instruct you that there is no such legal principle as applied to the loss of goods bailed without hire for the accommodation of the bailor.] This subject underwent careful examination in the case of Foster *v.* The Essex Bank, 17 Mass. 479, and the doctrine there enunciated has been adhered to ever since, if we may judge from what is laid down in Parsons on Contracts, title ' Bailment.'

" It has been likened to the case of servants in a tavern, to which it has no similitude. Guests in an inn are a profit to the keeper, and therefore are in the light of bailors for hire paid. Besides, innkeepers are held to strict account as a matter of public policy, but a guest at a private house would be placed on a different footing. He could scarcely urge a claim successfully

[Scott v. National Bank of Chester Valley.]

against his host for the loss of his goods through the dishonesty of servants, unless he would show that the man he was visiting, knew of their propensity.

"It was ruled by Lord Coke in Southcote's Case, that unless goods were *specially received*, they must be *safely kept* at the peril of the bailee. But the soundness of that case was questioned soon after, and was expressly overruled in Coggs v. Bernard, and has never since been considered sound. It is questionable whether the defendant would be held liable even under that case, as the ticket given to plaintiffs shows that the package was to be left at the risk of the depositors, *either from robbery or otherwise.* The question as to gross carelessness on the part of the bank in keeping these bonds, or the selection of their clerk, is one of fact to be decided by the jury. If it did not exist, your verdict will be in favor of the defendants. If it did, you will find for the plaintiffs the full value of the bonds at the time they were abstracted or stolen."

The verdict was for the defendants.

The plaintiffs removed the record to the Supreme Court and assigned for error the answers to the points and the parts of the charge in brackets.

*W. B. Waddell* and *W. Darlington* (with whom was *R. T. Cornwell*), for plaintiffs in error, cited Story on Agency, sect. 452; Bank of Kentucky v. Schuylkill Bank, 1 Parsons 215, 216.

*J. S. Futhey* and *P. Frazer Smith* (with whom was *G. F. Smith*), for defendants in error, cited Coggs v. Bernard, 2 L'd Raym. 909; Mytton v. Cock, 2 Strange 1099; Finucane v. Small, 1 Espinasse 315; Shiells v. Blackburne, 1 H. Blackstone 158; Foster v. The Essex Bank, 17 Mass. 479; Tompkins v. Saltmarsh, 14 S. & R. 275; Doorman v. Jenkins, 2 Adolph. & Ellis 256; Lancaster County Bank v. Smith, 12 P. F. Smith 47.

The opinion of the court was delivered, February 16th 1874, by

AGNEW, C. J.—As early as the case of Tompkins v. Saltmarsh, 14 S. & R. 275, it was decided that a delivery of a package of money to a gratuitous bailee, to be carried to a distant place, and delivered to another for the benefit of the bailor, imposes no liability upon the bailee for its safe-keeping, except for gross negligence. In that case, the package was stolen from the valise of the bailee, at an inn, in the course of his journey, after it had been carried to his room, in the usual custom of inns in that day (1822). The same rule is laid down by Justice Coulter, *arguendo* in Lloyd v. West Branch Bank. He says, a mere depositary, without any special undertaking, and without reward, is accountable for the loss of the goods, only in case of gross negligence,

which in its effects on contracts is equivalent to fraud. He further remarks, that the accommodation here was to the bailor, and to him alone, and he ought to be the loser, unless he in whom he confided, the bank or cashier, had been guilty of bad faith in exposing the goods to hazards to which they would not expose their own. These rules he derived from Coggs *v.* Bernard, 2 Lord Raymond 909, and Foster *v.* Essex Bank, 17 Mass. 501. In the latter case, the law of bailment was exhaustively discussed by Parker, C. J., and the conclusions were as above stated. It was further held, that the degree of care which is necessary to avoid the imputation of bad faith, is measured by the carefulness which the bailee uses towards his own property of a similar kind. When such care is exercised, the bailee is not answerable for a larceny of the goods, by the theft even of an officer of the bank. It is further said that from such special bailments even of money, in packages for safe-keeping, no consideration can be implied. The bank cannot use the deposit in its business, and no such profit or credit from the holding of the money can arise as will convert the bank into a bailee for hire or reward of any kind. The bailment in such case is purely gratuitous and for the benefit of the bailor, and no loss can be cast upon the bank for a larceny, unless there has been gross negligence in taking care of the deposit. These appear to be just conclusions, drawn from the nature of the bailment. The rule in this state is restated by Thompson, C. J., in Lancaster Bank *v.* Smith, 12 P. F. Smith 54. He says, " The case on hand was a voluntary bailment, or more accurately speaking, a bailment without compensation, in which the rule of liability for loss is usually stated to arise on proof of gross negligence." That case went to the jury on the question of ordinary care, and hence the observation of the Chief Justice that the same idea was sufficiently expressed by the judge below, in using the words " want of ordinary care." It may be proper, however, to say, that want of ordinary care is applicable to bailees with reward, when the loss arises from causes not within the duty imposed by the contract of safe-keeping, as from fire, theft, &c., and hence is not the measure in such a case as that before us, which we have seen is gross negligence. That case was one where the teller of the bank delivered the deposited bonds to a stranger calling himself by the name of the bailor, without taking sufficient care to be certain that he was delivering the package to the right person, and the bank was held responsible for his negligence. Then the teller in giving out the deposit, was acting in his official capacity, and hence the liability of the bank. The case before us now is different, the bonds being stolen by the teller, who absconded. This teller was both clerk and teller, but the taking of the bonds was not an act pertaining to his business as either clerk or teller. The bonds were left at the risk of the plaintiffs, and never entered into the business of

the bank. Being a bailment merely for safe-keeping for the bene-
fit of the bailor, and without compensation, it is evident the dis-
honest act of the teller was in no way connected with his employ-
ment. Under these circumstances, the only ground of liability
must arise in a knowledge of the bank, that the teller was an unfit
person to be appointed or to be retained in its employment. So
long as the bank was ignorant of the dishonesty of the teller, and
trusted him with its own funds, confiding in his character for in-
tegrity, it would be a harsh rule that would hold it liable for an
act not in the course of the business of the bank, or of the em-
ployment of the officer. There was no undertaking to the bailor
that the officers should not steal. Of course there was a confi-
dence that they would not, but not a promise that they should not.
The case does not rest on a warranty or undertaking, but on gross
negligence in care-taking. Nothing short of a knowledge of the
true character of the teller, or of reasonable grounds to suspect
his integrity, followed by a neglect to remove him, can be said to
be gross negligence, without raising a contract for care, higher
than a gratuitous bailment can create. The question of the bank's
knowledge of the character of the teller was fairly submitted to
the jury.

But it turned out that after the teller absconded, his accounts
were found to be false, and that he had been abstracting the funds
of the bank for about two years, to an amount of about $26,000.
It was contended that the want of discovery of the state of his ac-
counts for such a length of time, especially as he had charge of
the individual ledger, was such evidence of negligence as made the
bank liable. The court negatived this position, and held that the
bank was not bound to search his accounts for the benefit of a
gratuitous bailor, whose loss arose not from the accounts as kept
by him, but from a larceny, a transaction outside of his employ-
ment. We perceive no error in this. The negligence constituting
the ground of liability, must be such as enters into the cause of
loss. But the false entries in the books, and the want of their
discovery, was not the cause of the bailor's loss, and not connected
with it. True, the same person was guilty of both offences, but
the acts were unconnected and independent. True, the bank did
not discover in time the injury he did to it, but the very fact that
it did not discover his false entries and his peculations, repels the
knowledge of his dishonesty. The neglect was culpable, and might
have led to responsibility to those with whom they had dealings,
if they suffered from that neglect. But this neglect to examine
into his accounts, was not the cause of the bailor's loss. His loss
was owing to the immediate act of dishonesty of the teller, and not
to his purloining the funds, or falsifying the accounts of the bank.
The argument of the plaintiff results simply in this: that mis-
taken confidence is a ground of liability. But if this were the

[Scott *v.* National Bank of Chester Valley.]

rule, business would stand still; for without a common degree of confidence in agents and officers, much of the business of the world must cease. The facts were fairly left to the jury, with the proper instruction.

Another complaint is, that the teller was suffered to remain in employment after it was known that he had dealt once or twice in stocks. Undoubtedly the purchase or sale of stocks is not *ipso facto* the evidence of dishonesty, but as the judge well said, had he been found at the gaming-table, or engaged in some fraudulent or dishonest practices, he should not be continued in a place of trust. So if the president of the bank, when he called on the brokers who acted for the teller in the purchase of the stock, had discovered that he was engaged in stock-gambling, or in buying and selling beyond his evident means, a different course would have been called for. No officer in a bank, engaged in stock-gambling, can be safely trusted, and the evidence of this is found in the numerous defaulters, whose peculations have been discovered to be directly traceable to this species of gambling. A cashier, treasurer, or other officer having the custody of funds, thinks he sees a desirable speculation, and takes the funds of his institution, hoping to return them instantly, but he fails in his venture, or success tempts him on; and he ventures again to retrieve his loss, or increase his gain, and again and again he ventures. Thus the first step, often taken without a criminal intent, is the fatal step, which ends in ruin to himself and to those whose confidence he has betrayed. Hence any evidence of stock-gambling, or dangerous outside operations, should be visited with immediate dismissal. In this case, the operations of the teller in stocks as a gambler in them, were unknown to the officers of the bank until after he had absconded. Upon the whole, the case appears to have been properly tried, and finding no error in the record, the judgment is affirmed.