67 P.(2d) 240

STATE ex rel. SOFEICO v. HEFFERNAN.

No. 4159.

Supreme Court of New Mexico.

Dec. 22, 1936.

Rehearing Denied April 23, 1937.

Frank H. Patton, Atty. Gen., and Edward P. Chase, Asst. Atty. Gen., for appellant.

Edward D. Tittmann, of Hillsboro, for appellee.

ZINN, Justice.

This is an appeal prosecuted to this court from an order of the district court discharging appellee from custody on his petition for a writ of habeas corpus. Appellee was arrested on April 13, 1935, on a charge of having in his possession part of a game animal, to wit, the skin of a bear, contrary to the provisions of Laws 1931, c. 117, § 8.

Appellee had theretofore been arrested on March 31, 1935, charged with killing a bear out of season. He was sentenced to a fine and imprisonment, from which, however, on the 5th day of April, 1935, appellee was discharged on a writ of habeas corpus. No appeal was prosecuted from such discharge. The writ was allowed on the theory that there is no such crime in the state of New Mexico as described in the complaint, to wit: "Killing a bear out of season." The bearskin in the instant case is of the said bear.

Appellee contends below and here that the crime now charged is a part of the same crime for which he was originally sentenced to imprisonment and from which imprisonment he was released by the lower court on April 5, 1935, and that such finding precludes any new prosecution for any alleged crime, to prove which it would be necessary to prove the same facts as would have had to be proved in the former charge. In other words, if it is not a crime to kill a bear in New Mexico, the possession of the hide of such bear cannot be a crime, and in any event, having been discharged and no appeal prosecuted on the charge of killing a bear, he cannot be again prosecuted for possessing the skin of the bear.

The prosecution of the appellee in both instances in the justice court was based on certain rules and regulations made by the State Game Commission. These rules were promulgated by the Game Commission pursuant to Laws 1931, c. 117.

Two very interesting and clear-cut issues of law are presented to us for disposition. Disposing of the first question in favor of appellee eliminates any necessity of treating the second question.

The first question presented is simply this:

Appellee questions the constitutionality and validity of Laws 1931, c. 117, on the theory that it delegates legislative powers to the State Game Commission. The Attorney General contends that the statute merely confers on the Game Commission power to determine certain facts and then act upon these facts in accordance with the legislative direction.

In considering this proposition of law, it becomes necessary to set forth herein the pertinent parts of the statute under consideration.

Chapter 117 of the Session Laws of 1931, under which this prosecution was had, is entitled, in part: "An Act Relating to Game

and Fish: Authorizing the Making and Promulgation of Regulations by the State Game Commission, and Providing Penalties for the Violation of Such Regulations."

Sections 1, 2, and 3 read as follows:

"Section 1. It is the purpose of this act and the policy of the State of New Mexico to provide an adequate and flexible system for the protection of the game and fish of New Mexico and for their use and development for public recreation and food supply, and to provide for their propagation, planting, protection, regulation and conservation to the extent necessary to provide and maintain an adequate supply of game and fish within the State of New Mexico.

"Sec. 2. The State Game Commission is hereby authorized and directed to make such rules and regulations and establish such service as it may deem necessary to carry out all the provisions and purposes of this act, and all other acts relating to game and fish, and in making such rules and regulations and in providing when, to what extent, if at all, and by what means game animals, birds and fish may be hunted, taken, captured, killed, possessed, sold, purchased and shipped, the State Game Commission shall give due regard to the zones of temperatures, and to the distribution, abundance, economic value and breeding habits of such game animals, birds and fish. * * *

"Sec. 3. The State Game Commission, in addition to the powers now vested in it, and not as a limitation of such powers, is expressly authorized and empowered by regulation adopted and promulgated in the manner hereinafter provided, to: (a) Define game birds, game animals and game fish; (b) Establish open and closed seasons for the killing or taking of all kinds of game animals, game birds and game fish, and to change such open seasons from year to year, and to fix different seasons for different parts of the state; (c) Establish bag limits covering all kinds of game animals, game birds and game fish, and the numbers thereof which may be killed or taken by any one person during any one day or during any one open season; (d) Authorize or prohibit the killing or taking of any game animals, game birds or game fish of any kind or sex; (e) Prescribe the manner, methods, and devices which may be used in hunting, taking, or killing game animals, game birds, and game fish."

Section 4 reads as follows:

"Any regulation of the State Game Commission reduced to writing, adopted by an affirmative vote of a majority of the members of the State Game Commission, signed by the President and attested by the Secretary of the State Game Commission, filed in the office of the State Game Warden, and published as provided by Section 11, Chapter 35, Session Laws of 1921 (Section 57-111, Compilation of 1929) shall be deemed to have been duly adopted and promulgated, and shall become effective fifteen (15) days after such publication.

"A copy of any such regulation certified by the State Game Warden to be a true copy and to have been adopted, signed, filed

and published as aforesaid, shall be prima facie evidence in any court in this State of the adoption, publication and promulgation of such regulation.

"The State Game Warden shall furnish a true copy of any such regulation to any person, firm or corporation, on request."

█ The record before us does not disclose whether the regulations under which the appellee was prosecuted were properly promulgated. We assume such regulations were properly promulgated and that a certified copy as provided by said section 4 was properly introduced at the prosecution of appellee. Such assumption is based on the fact that appellee does not question on that score the validity of the conviction in the justice of the peace court.

Section 7 reads in part as follows: "Any person who shall violate or fail to comply with regulations adopted and promulgated by the State Game Commission, pursuant to the provisions of this Act, or any other act, or who shall violate any of the provisions of any act relating to game or fish, now or hereafter in force, shall, upon conviction, be fined not less than twenty-five ($25.00) dollars nor more than three hundred ($300.00) dollars, or imprisoned not less than one day nor more than ninety days, or both such fine and imprisonment, in the discretion of any court."

Under authority conferred upon the State Game Commission by said statute, bear are defined as big game animals by regulation No. 57, section 2, which regula-

tion was published according to law March 15, 1934. This statement is also from the brief of the Attorney General and not controverted by appellee. We accept its truth for the purpose of this opinion.

Seasons for game are subject to change, and therefore are contained in a digest published each year by the Department of Game and Fish. The open season for bear as established by the State Game Commission, under authority conferred upon it by said Laws 1931, c. 117, § 3, is from October 1st to December 10th of each year. A copy of the digest of game and fish laws is found in the brief of the Attorney General, and its accuracy is not questioned by appellee. We accept it as such. It reads as follows:

"Under authority conferred upon the State Game Commission by Chapter No. 117 of the 1931 Session Laws of the Tenth Legislature of the State of New Mexico, the following open seasons and bag limits for game animals, game birds, and game fish are hereby established, effective April 1, 1934, and this regulation shall remain in effect until changed by order of the State Game Commission.

"Section 1. The Seasons and Bag Limits For Big Game Shall Be:

"Bear: One per season, October 1 to December 10, inclusive.

"Dogs shall not be used in hunting bear during the deer season, and traps shall not be permitted at any time.

"Deer: (Mule deer, Virginia White Tail and Arizona White Tail). October 25 to November 15, inclusive.

"Turkeys and Squirrels: October 25 to November 15, inclusive.

"Bag limit, one buck deer with horns six inches or more in length, two turkeys and five squirrels.

"Elk: There shall be a special permit season on elk on the Pecos River watershed, north of a line drawn east and west through the town of Pecos and not to exceed 100 special permits at $10 each shall be issued. Applications shall be received up to September 30, and permittees shall then be determined by a public drawing if there are more than 100 applicants. The season shall be October 25 to November 15, inclusive, with a limit of one bull elk with 3 points on each horn. Hunting shall conform to rules prescribed by the State Game Warden, and hunters shall check in and out at such points as may be designated by him. Permittees must also possess regular big game hunting licenses."

Appellee very interestingly argues that the true rule ought to be that animals feræ naturæ should rightfully be held to be in the owner of the land on which the animals are. Appellee supports this argument with a citation from Holdsworth's History of English Law, vol. 1, pp. 94-109, and vol. 7, p. 494. It is appellee's contention that the generally accepted American doctrine, to wit, that the state, in the exercise of its police power, has the right to regulate the taking of game so as to protect the same in the interest of the food supply, is a mere fiction. That this is merely a smoke screen, curtaining its real purpose which appellee claims is legislation for the special benefit of those who may belong to gun clubs, or who possess the leisure and qualifications of sportsmen. Appellee cites the dissenting opinion of Justice Van Dyke, in Ex parte Kenneke, 136 Cal. 527, 69 P. 261, 262, 89 Am.St.Rep. 177 in support of his argument. Nevertheless, we are not impressed with this intriguing argument. We believe the prevailing American doctrine sound in law, principle, and common sense.

All the authorities are to the effect that the state holds title to the wild animals in trust for the people. No individual has any title to any such animal until he reduces it to lawful possession. As trustee for the people, the state through its Legislature may enact laws designed to conserve wild life, and regulate or prohibit its taking in any reasonable way it may deem necessary for the public welfare, so long as it does not violate any organic law of the land.

As stated by the Supreme Court of Washington in a leading case: "Under the common law of England all property right in animals feræ naturæ was in the sovereign for the use and benefit of the people. The killing, taking, and use of game was subject to absolute governmental control for the common good. This absolute power to control and regulate was vested in

the colonial governments as a part of the common law. It passed with the title to game to the several states as an incident of their sovereignty, and was retained by the states for the use and benefit of the people of the states, subject only to any applicable provisions of the federal Constitution." Cawsey v. Brickey, 82 Wash. 653, 144 P. 938, 939, and cases therein cited.

In New Mexico, as in many other states, game and fish have been, and continue to be, a source of food supply. Wild animals are not of common right open to capture and possession by the public. This may have been true in the early Indian days, when no necessity existed for restrictions, and when the native residents as well as the newcomers were largely dependent upon hunting and fishing for food to supplement the supply brought by wagon trains over the Santa Fé Trail. This status has long since passed. It is now generally recognized that New Mexico's valuable wild animal life would soon be exterminated if the state should fail to conserve it and aid in its reproduction.

Other states have enacted laws with this purpose in view, and, whenever this has been done without trenching on private rights protected by the Constitution, such acts have been almost uniformly upheld. 12 R.C.L. 691, and cases therein cited. Nearly every conceivable regulation for the propagation, conservation, taking, and disposal of fish and game has been upheld where no constitutional objections have stood in the way. Generally, courts have given very liberal construction to such statutes, to the end that the public welfare should be subserved.

We do not agree with Justice Van Dyke in his dissenting opinion in the case of Ex parte Kenneke, supra, wherein he says: "The women and children of the state, and the men who have not sufficient time to hunt game, and the old and infirm, and such as are not endowed with good sight, are all deprived of any use or benefit in the wild game unless some sportsman friend may see proper to give it to them. He has read history to very little purpose who does not know that game laws such as this, enacted and enforced in the interests of a privileged few, have been the fruitful source of the oppression of the masses of the people, and have caused more popular discontent and resentment than almost any other subject. It were better to exterminate the game at once than to preserve it for the special benefit only of a favored few."

It may be true that many of us prefer immersion in fiction or history to the rod and reel or an afternoon of bridge to the chase of game with gun. Justice Van Dyke is not sufficiently acquainted with the hunting and fishing fraternity when he states that women, children, the aged, and infirm are being deprived of any use or benefit of wild game. We could almost take judicial notice of the fact that some of the best hunters and fishermen are women and children. Even the aged and infirm are often seen on the banks of a river or lake with rod and bait. Many of us cannot forget our child-

hood days when, with bamboo, pinhook, and worm, we enjoyed an afternoon's meditation beside a lake, totally indifferent as to whether the worm drowned or the fish was caught, to accept unqualifiedly the opinion of Justice Van Dyke that children are deprived of any use or benefit of wild game.

It may be true that either because of inherent laziness, soft muscles, or total indifference we now join the ranks of nonfishers and nonhunters and depend upon the bounty of some sportsman friend to enjoy a trout or cut of venison in season, yet even we davenport, sofa, or softchair sportsmen receive some of the food supply which is protected by the game laws, and which would be otherwise exterminated.

Appellee argues that judges are notorious hunters and fishermen, hence the universal judicial opinions sustaining game laws. Appellee cites no authorities in support of his condemnation (or praise) of the judges as being sportsmen, and we cannot take judicial notice thereof.

Reverting to the issue.

■ The state of New Mexico under its police power, and to carry out its trust, passed the statute (Laws 1931, c. 117) in question. So far as it affects the public, the main purpose of the statute is reasonable, and (with one exception, which will hereafter be discussed) is not contrary to any provision of the Federal or State Constitution. Here we have a statute aimed to conserve the property of the state which it holds in trust for the public. It should be given a liberal construction to sustain its validity, and it cannot be set aside unless it clearly violates the organic law of the nation or state.

■ The Legislature for the protection of the game and fish of New Mexico and for the purpose of regulating their use and enjoyment, for public recreation and food supply (chapter 117, § 1), has vested in the State Game Commission, an administrative branch of the executive department, the administration of our game and fish, and to this commission is intrusted the duty of safeguarding this property in the interest of the public. The statute in question is an exercise of the state's power in carrying out its large and comprehensive conservation program of promoting and protecting the public resources, and the comfort and happiness of its people.

The Supreme Court of the United States, in Lacoste v. Department of Conservation, 263 U.S. 545, 44 S.Ct. 186, 187, 68 L.Ed. 437, in upholding a law of Louisiana, where a tax was levied upon furs taken from animals captured in the state, in the hands of dealers, and which act also covered regulations in detail of the whole subject of hunting, trapping, and disposition of the furs so taken, said:

"The wild animals within its borders are, so far as capable of ownership, owned by the state in its sovereign capacity for the common benefit of all of its people. Because of such ownership, and in the exercise of its police power the state may regulate and control the taking, subsequent use and

property rights that may be acquired therein. * * *

"The legislation is a valid exertion of the police power of the state to conserve and protect wild life for the common benefit. It is within the power of the state to impose the exaction as a condition precedent to the divestiture of its title and to the acquisition of private ownership. * * * Wild animals permitted by the state to be taken and reduced to possession on prescribed conditions may reasonably be distinguished from other classes of property. * * * Protection of the wild life of the state is peculiarly within the police power, and the state has great latitude in determining what means are appropriate for its protection."

The decision held the Louisiana act constitutional, and the same principle applies to the act here in question. The statute is a valid enactment under the police power of the state.

The appellee, however, presents the proposition that the act itself contravenes N. M. Const. art. 3, § 1, as being a delegation of legislative power to an executive department. With this contention in its entirety we cannot agree.

We have here a statute made by the enacting body in the exercise of its police power. The validity of the grant of discretion depends largely upon the nature of the business or thing with respect to which it is to be exercised, and as to whether or not the proper regulation and control thereof require that a discretion be vested in one or more public officials in order properly to control the conduct of the business, or the use, etc., of the article or thing in question.

On the question of the validity or invalidity of statutes vesting discretion in public officials without prescribing definite rules of action, we find exhaustive case notes in 12 A.L.R. 1435, 54 A.L.R. 1104, and 92 A.L.R. 400.

■ From a reading of many cases, we find the general rule to be that a statute or ordinance which vests arbitrary discretion with respect to an ordinarily lawful business, profession, appliance, etc., in public officials, without prescribing a uniform rule of action, or, in other words, which authorizes the issuing or withholding of licenses, permits, approvals, etc., according as the designated officials arbitrarily choose, without reference to all of the class to which the statute or ordinance under consideration was intended to apply, and without being controlled or guided by any definite rule or specified conditions to which all similarly situated might knowingly conform, is unconstitutional and void.

■ However, within this rule is another rule: "It is also well settled that it is not always necessary that statutes and ordinances prescribe a specific rule of action, but on the other hand, some situations require the vesting of some discretion in public officials, as, for instance, where it is difficult or impracticable to lay down a definite, comprehensive rule, or the discretion relates to the administration of a police regulation and is necessary to protect the public morals.

health, safety, and general welfare." 12 A. L.R. 1447.

Laws 1931, c. 117, relates to the administration of a police regulation.

The Legislature meets once every two years, and then only in session for 60 days or less. N.M.Const. art. 4, § 5. It is concerned with many affairs of state other than the protection of our wild life. The knowledge and ability required of providing means to preserve, propagate, and protect the birds in the air, the beasts in our forests, and the fish in our streams and lakes, requires years of study and knowledge beyond that of the average man. Considering all the elements involved, it would be unreasonable and unscientific to expect the Legislature to determine in advance when a game or fish season should be open or closed, when and where game and bird preserves should or should not be established. If a drouth or flood should occur, which, coupled with an open season, might exterminate any of the game, fish or bird species, it would be beyond common sense to call into special session the Legislature for the express purpose of closing a season which had theretofore been declared open by statute to preserve and save from extinction some species of game or fish. A senseless and narrow technical construction might hold that chapter 117 in its entirety is a delegation of legislative power. We cannot view the same in that light.

We find that in the necessary exercise of the police power of the state some discretion must be vested in our State Game Commission. It is difficult and impracticable for the Legislature to lay down definite, minute, and comprehensive rules in the matter of game protection. This the State Game Commission can do. This the Legislature authorized the commission to do. This is not a delegation of legislative power, but in chapter 117, § 2, and all of section 3, except subsection (a) thereof, we merely find the authority for the Game Commission to determine certain facts or a state of things upon which the law has already acted, depending upon the determination of such facts or state of things by the Game Commission. This is not the enactment of substantive law. Locke's Appeal, 72 Pa. 471, 13 Am.Rep. 716.

The Game Commission has the power to establish open and closed seasons and prescribe the method of killing or capturing the same, and to establish bag limits. These are mere matters of fact to be determined by the Game Commission incident to its administration of the trust.

By analogy, we can assume a forestry commission intrusted with the care and management of the timber lands of the state. To such commission would be intrusted the care, management, and sale of timber. It would be unreasonable to say that the Legislature, and it alone, by statute must regulate the time when timber is to be cut, which trees must be cut, and the type of tools to be used in the logging operation. Common sense answers the query in the supposed case by the creation of a forestry commission and the same reasoning is applicable in the instant case.

We now come to the Achilles heel of the act under consideration. By subsection (a) of section 3, the State Game Commission is authorized to define game birds, game animals, and game fish. Under this provision the State Game Commission would have authority to designate range cattle, rattlesnakes, jack rabbits, or cottontail rabbits as "game animals" when they are clearly not such as known to the law. We do not question the right of the Legislature to place its protective arm about any wild animal and protect it from extinction and intrust such protection to the Game Commission. No such authority exists in the executive branch of our government and the Legislature cannot delegate such authority. The term "game" is to be understood in its ordinary signification, and includes all game birds, game fowl, and game animals. Although we find that in New Mexico the Legislature has denominated a bear as a game animal, Laws 1935, c. 123, § 1, subsec. 3; nevertheless it is a predatory animal primarily, and has been so recognized by our Legislature. Five different territorial legislatures enacted laws placing bounties on the scalp of bear. See 1897 Compiled Laws, § 763; 1899 Session Laws, c. 38, § 1; 1901 Session Laws, c. 10, § 1; 1903 Session Laws, c. 80, § 1; 1905 Session Laws, c. 77, § 1. The State Game Commission cannot, by resolution, declare that a jack rabbit is a game animal. This is clearly a legislative function.

The Legislature, representing the people, and the Legislature alone, can define what is and what is not a game animal, and the Legislature can make it a criminal offense to kill wild animals which are either predatory animals or game animals. Such power cannot be delegated. The Attorney General offers no authority supporting a contrary view, and our search has disclosed none.

The courts are almost unanimous in upholding the power of commissions under statutes similar to ours to fix hunting season; and promulgate regulatory orders. There is an annotation in 34 A.L.R. at page 832, and the following cases have been decided since the writing of the note: Musgrove v. Parker, 84 N.H. 550, 153 A. 320; Van Camp Sea Food Co. v. Department of Natural Resources (D.C.) 30 F.(2d) 111; Ex parte Lewis, 101 Fla. 624, 135 So. 147; People v. Soule, 238 Mich. 130, 213 N.W. 195; Horne v. State, 170 Ga. 638, 153 S.E. 749.

In so far as chapter 117 authorizes the State Game Commission to promulgate orders providing when, to what extent, and by what means game may be hunted, taken, captured, killed, possessed, sold, purchased, and shipped, we hold that said chapter 117 does not contravene the Constitution of the State of New Mexico, but as to that provision of said statute which authorizes the State Game Commission, an arm of the executive branch of our government, to define game birds, game animals, and game fish, we hold that it is an unlawful delegation of legislative authority, and therefore contravenes article 3, § 1, of the N.M.Const. The legislative branch, and it alone within the limitations of the Constitution, can

create substantive law, and the right to define what constitutes a game animal is clearly substantive law. The clearest analogy to the power herein attempted to be delegated would be an act of the Legislature authorizing a commission to define what constitutes intoxicating liquor. Clearly the courts could not sustain such a delegation of legislative authority.

Having disposed of the first question, it becomes unnecessary to determine the second proposition presented herein; namely, whether the possession of a bearskin is a separate and distinct offense from that of killing the bear from which the skin was taken.

The appellee was held to answer the charge that he had violated certain regulations promulgated by the State Game Commission under an authority claimed by said commission pursuant to Laws 1931, c. 117, § 3. We hold that such authority does not exist. The trial court so held, and the appellee was discharged on his application for a writ of habeas corpus. We find no error in the ruling of the trial court in discharging the appellee from custody on his petition for a writ of habeas corpus, and the judgment of discharge will be affirmed.

It is so ordered.

SADLER, C. J., and HUDSPETH, BICKLEY, and BRICE, JJ., concur.

## On Rehearing.

ZINN, Justice.

On rehearing, the Attorney General presents a proposition not specifically and directly presented when we first considered the case. It is now his contention that the charge against appellee of unlawfully possessing the bearskin was not based upon the violation of a regulation of the Game Commission, but rather on Laws 1931, ch. 117, § 8. Clearly that is true.

However, the foundation of this latter case is the first case. Appellee was first charged with killing a bear out of season. The State contended at that time that this species of animal is a game animal, not because the Legislature defined it to be a game animal, but because the Game Commission, pursuant to its regulation No. 57 declared the bear to be a game animal. The Game Commission claimed authority to define bear to be a game animal in Laws 1931, ch. 117. The theory under which the appellee was prosecuted in both cases in the justice of the peace court, and the theory urged upon the district judge in the habeas corpus proceedings, was not that the bear had been defined or classed as a game animal by any legislative declaration, but was predicated upon the Game Commission's pronouncement that the bear was a game animal.

We said in our opinion that the Game Commission cannot do this without a prior legislative declaration that the bear is a game animal. From this statement of the law we do not recede. The entire case, beginning with the prosecution in the justice of the peace court on to the final appeal, presented the question as to whether or not the Legislature could delegate to the Game Commission the right to define

game animals. The district court as well as this court was led into a consideration of the question of delegation of powers. This question we determined.

Our attention has now been called (on rehearing) to Laws 1935, ch. 123, § 1, sub-sec. 3, amending 1929 Comp.St. § 57-217, which provides as follows: "A big game license shall entitle the person named therein to hunt big game and other game quadrupeds during the season therefor. (Deer, bear and wild turkey are classified as big game.)"

The Attorney General contends that bear is a game animal because of this legislative act. If the Legislature has defined bear to be a game animal, then clearly the appellee violated the law.

■ In view of our opinion, nothing would prevent the Game Commission from fixing the open and closed seasons on such game animal. It would properly be within the powers of the Legislature to delegate to the commission such power. In prosecuting the appellee, charging him with either killing or having in his possession a part of a game animal, the State would have to base its case on both a statute showing that bear was a game animal and also. that such animal had been killed out of season. To support such charge the State would have to invoke a statute defining bear to be a game animal and rules and regulations of the commission to show that the bear was killed out of season.

It may be questioned whether this legislative declaration (Laws 1935, ch. 123, supra) is sufficient to classify bear as a game animal. However, we have made an independent search of our statutes relating to game, to ascertain if the Legislature has already declared the bear to be a game animal.

■ In our original opinion we stated, "The legislature has denominated a bear as a game animal, Laws 1935, c. 123, § 1, subsec. 3." That act would not be sufficient to validate a regulation of the commission theretofore made making bear a game animal because, in the first place, it did not purport to be a validating act, and, further, if the Legislature had no power to delegate the function of designating game animals to the commission, it is doubtful whether they could afterwards validate such an unconstitutional action. In our original opinion we did not consider the fact that subsection 3 of section 1, ch. 123, Laws 1935, so far as it bears on what is a game animal is concerned, was merely a re-enactment of subsection 3 of 1929 Comp.St. § 57-217, which in turn was the compilation of a portion of Laws 1927, c. 34. The Attorney General did not call our attention to this, and we assumed that the Legislature had never, prior to 1935, said that bear was a game animal.

■ Our search of the statutes discloses that the Legislature by chapter 34, Laws 1927, did intend to denominate bear a game animal. This is apparent from reading the same. Section 1 of that act amends section 12 of chapter 47, Code 1915, as amended by section 7, ch. 101, Laws

1915, as amended by section 3, ch. 133, Laws 1919. In tracing the pertinent parts of the amended section, we find that section 2435, Code 1915 (Act June 14, 1912, Laws 1912, c. 85), said: "No person shall at any time shoot, hunt or take in any manner any game which is by law protected in this state without first having in his possession a hunting license as hereinafter provided for the year in which such shooting or hunting is done. * * * A big game license shall entitle the person therein named to hunt game quadrupeds during the open season therefor. (Wild turkeys are classified as big game under the meaning of the chapter.)"

This section was amended by Laws 1915, c. 101. There was a re-enactment or amendment of the section, but subsection 3 remained the same. This was amended by chapter 133, Laws 1919, but no change was made in subsection 3. Then at the 1927 Session, chapter 34, section 3, was amended by changing the part in parenthesis so as to read "(Deer, bear, and wild turkey are classified as big game.)" In the same act appears section 2, which amends section 1 of chapter 154, Laws 1921, as amended by section 3 of chapter 57, Laws 1925. This section 1 of chapter 154, Laws 1921, so amended was an amendment of section 2438, Code 1915, as amended by section 4, c. 133, Sess. Laws 1919. In tracing this legislation, we see that in section 2438, which was a portion of the Act of June 14, 1912, it was declared: "The open season for hunting, taking or possessing any of the animals, birds or fish protected by this chapter shall be between the following named dates only, both inclusive."

Likewise bear was not mentioned in the amendment of this section made in chapter 133, Laws 1919. Likewise bear was not mentioned in the amendment made by chapter 154, Laws 1921, but by section 2 of chapter 34, Laws 1927, the Legislature, by way of amendment of the earlier enactments, declared: "The open season in each year for hunting, taking or possessing any of the game animals or birds protected by this Act shall be: * * * For bear from October 10th to October 31st, both inclusive, limited to one bear in a season."

In the same amendatory act (chapter 34, Laws 1927) where, in section 1, whereby section 12 of the original act was amended, the Legislature indicated in subsection 3 thereof that a bear is a game animal "protected by this Act," they also further in the same amended other sections so as to specifically show that bear was to be protected by "this act" by declaring the open season on said bear to be limited to 22 days and further limited to one bear in a season.

Our original opinion is correct if the only definition of a game animal is to be found in the rules and regulations of the Game Commission. But the bear as a game animal is sufficiently defined in the statute and has been so defined long prior to the offense alleged to have been committed by appellee. This being so, the appellee was properly charged with the unlawful killing of a game animal, to wit, a bear.

This brings us necessarily to another point raised by appellee to sustain his discharge on habeas corpus. He claims he was discharged by the district court in the first habeas corpus (which order of. discharge became final, because no appeal was taken), and therefore such final decree of discharge becomes res adjudicata to the second prosecution.

The question thus presented is whether or not the possession of a bearskin in the instant case becomes a separate and distinct offense from that of killing the bear from which the skin was taken or was the adjudication by the trial court in the first habeas corpus proceeding a bar to a prosecution on the second charge?

On March 31, 1935, the appellee was charged with killing a bear out of season. The trial court in the subsequent habeas corpus proceeding released the appellee on the theory that it is no crime in the State of New Mexico to kill a bear out of season. From this judgment no appeal was prosecuted by the State.

■■■ So long as a judgment remains unappealed from and in full force, it does not detract from its effect as a bar to further suits upon the same cause of action that it may be erroneous, so as to be reversible on appeal or error, or so irregular that it would be vacated on a proper application for that purpose. See 34 C.J. § 1184.

■■■ No appeal having been prosecuted, the judgment was final. Therefore, to all legal intents and purpose, that particular bear was by judicial decree held not to be a game animal. Such judgment becomes res judicata as to any and all future litigation between the same parties (State v. Heffernan) involving that particular bear's status as a game animal.

The particular bear in question is no more a game animal to support the charge of the state that the appellee had in his possession the skin of a game animal, to wit, a bear, than would such a charge be supported had the bear been a circus bear. The appellee invokes a rule of law too well established in our jurisprudence, the rule of res judicata.

■■■ Under this rule the judgment or decree of a court of competent jurisdiction upon the merits concludes the parties and privies to the litigation and constitutes a bar to a new action or suit involving the same cause of action either before the same or any other tribunal. Under this rule any right, fact, or matter in issue, and directly adjudicated upon, or necessarily involved in, the determination of an action before a competent court in which a judgment or decree is rendered upon the merits, is conclusively settled by the judgment therein and cannot again be litigated between the parties and privies whether the claim or demand, purpose, or subject matter of the two suits is the same or not. See 34 C.J. § 1154.

In the case now before us the parties were the same as in the previous habeas

corpus proceedings. The matter first adjudicated was that the particular bear in question was not a game animal. To prove the instant case the State would have to prove that the skin in possession of the appellee was taken from a bear that was a game animal. The court having already adjudicated (between these same parties, even though erroneously) that the bear was not a game animal, it is not the policy of the law to permit this same question between the same parties to be again litigated.

 Res judicata is a rule of universal law pervading every well-regulated system of jurisprudence, and is put upon two grounds, embodied in various maxims of the common law; the one, public policy and necessity, which makes it to the interest of the state that there should be an end to litigation, the other, the hardship on the individual that he should be vexed twice for the same cause.

The final determination of the original action as to the entire subject of the controversy (Is a bear a game animal?), and such controversy and every part of it, must stand irrevocably closed by such determination.

The appellee could not again be prosecuted for killing the bear, and he cannot be prosecuted for having in his possession the skin of that same bear.

For the reasons given the result announced in our original opinion sustaining the ruling of the trial judge in discharging the appellee from custody on his petition for a writ of habeas corpus must stand. The motion for rehearing is denied.

It is so ordered.

HUDSPETH, C. J., and SADLER, BICKLEY, and BRICE, JJ., concur.