1999-NMCA-021

973 P.2d 884

In the Matter of the Protest of Frank D. **ALEXANDER** and Violet Alexander, Plaintiffs–Appellants,

v.

David K. **ANDERSON**, Assessor of Bernalillo County, New Mexico, Defendant–Appellee.

In the Matter of the Protest of Edward J. Gerety and M.H. Gerety, Plaintiffs–Appellants,

v.

David K. Anderson, Assessor of Bernalillo County, New Mexico, Defendant–Appellee.

In the Matter of the Protest of Paul R. Duncan and Marilyn H. Duncan, Plaintiffs–Appellants,

v.

David K. Anderson, Assessor of Bernalillo County, New Mexico, Defendant–Appellee.

In the Matter of the protest of David B. Mosely, Plaintiff–Appellant,

v.

The Bernalillo County Valuation Board, Defendant–Appellee.

No. 18041, 18135, 18161, 18484.

Court of Appeals of New Mexico.

Jan. 5, 1999.

James E. Kirk, Albuquerque, for Frank D. and Violet Alexander.

Raymond G. Sanchez, Robert J. Desiderio, Albuquerque, for Edward J. Gerety, M.H. Gerety, Paul R. Duncan, and Marylin H. Duncan.

Hessel E. Yntema, III, Oman, Gentry & Yntema, P.A., Albuquerque, for David B. Mosely.

Frank D. Katz, Special Assistant Attorney General, Santa Fe, for Amicus Curiae.

Tito D. Chavez, Bernalillo County Attorney, M. David Chacon, II, Assistant County Attorney, Jeffrey S. Landers, Assistant County Attorney, Albuquerque, for Defendant–Appellee.

## OPINION

ARMIJO, Judge.

{1} Frank D. Alexander, Violet Alexander, Paul R. Duncan, Marilyn H. Duncan, Edward J. Gerety, M.H. Gerety, and David B. Moseley (collectively, Taxpayers) appeal from decisions of the Bernalillo County Valuation Protests Board (the Board) affirming the Bernalillo County Assessor's (the Assessor) denials of "agricultural use" tax exemptions for the 1996 tax year. The "agricultural use" exemption presents a favorable method of property tax valuation which grants significant tax relief to qualifying property owners. This consolidated appeal presents this Court with a question of first impression: we must construe the Legislature's intent in its provision of the "agricultural use" exemption and give explicit meaning to its chosen words. *See* NMSA 1978, § 7–36–20(A) (1973, as amended through 1997). We also review the Board's application of Section 7–36–20 to the facts of each Taxpayer's request for an "agricultural use" exemption. Upon this review, we affirm the Board's decision below as to each Taxpayer.

## FACTS AND PROCEDURAL POSTURE

{2} The Assessor issued each denial for the 1996 tax year after having consistently granted Taxpayers the exemption in previous years. No change in law or Taxpayers' use of the subject properties precipitated the denials. Rather, the Assessor based its contested decisions on site visits and assessments, a procedure it contends it was unable to conduct thoroughly in prior years due to budget constraints. The legal issues presented in these appeals apply uniformly to each taxpayer. However, we discuss individually the facts specific to each appellant.

(A) *Frank D. Alexander and Violet Alexander*

{3} The Alexanders purchased their property, four contiguous parcels comprising 2.25 acres located in Albuquerque's North Valley, in 1982. At that time, alfalfa grew on the land. In previous years, they sold the alfalfa, later planting hay and pasture grass. They have since sold some of the grass on occasion; however, it has primarily served as feed for their horses. Upon its review of the record, the Board upheld the Assessor's denial of the Alexanders' "agricultural use" exemption application, finding that the primary use of the property is to raise or sustain their recreational horses.

(B) *Paul R. Duncan and Marilyn H. Duncan*

{4} The Duncans own 2.09 acres, also in Albuquerque's North Valley. On this appeal, however, the tax treatment of only 1.59 acres is at issue. The subject property supports "K-31 grass," a vegetable garden, and twelve to thirteen fruit trees, all of which surround "and [are] made part of the house, swingset/play area, driveway area, ... landscaping and other appurtenant portions of the residence." Once each year since 1988, the Duncans have paid someone to cut and bale their hay. However, they maintain the grass primarily as a lawn, saving only a small portion to be cut and baled each year. Finally, the Duncans own no livestock. Upon its review of the record, the Board upheld the Assessor's denial of the Duncans' "agricultural use" exemption application, finding that the primary use of the property is a residential "homesite" and not land primarily put to agricultural use.

(C) *Edward J. Gerety and M.H. Gerety*

{5} The Geretys have owned two lots in the North Valley of Albuquerque since 1969. They use the first, a 3.79-acre parcel, of which the tax treatment of only 3.29 acres is here at issue, to graze horses, grow hay, and support an orchard and garden. They use the second, a 2.13-acre lot, for the same purposes. The Board upheld the Assessor's denial of the Geretys' "agricultural use" exemption application, finding that the properties do not primarily serve an agricultural purpose.

(D) *David B. Moseley*

{6} Moseley owns the largest tract of property affected by this appeal: approximately ten acres in Albuquerque's North Valley which he has owned for nearly four decades. The property, zoned for agricultural use, consists of irrigated land and contains several outbuildings. Barbara Moseley, the occupant, grows grass and grazes horses upon the land. In past years, mares have foaled on the property, but currently it is occupied by aging race horses which the occupant cannot bring herself to send to slaughter. She has not sold any horses for three years, nor maintained a stud on the property for two years. Finally, the property contains some twenty-four fruit and nut trees, the products of which are primarily consumed by birds. Upon its review, the Board upheld the Assessor's denial of Moseley's application for an "agricultural use" exemption, finding that the property is primarily used as a residence.

*THE "AGRICULTURAL USE" EXEMPTION*

{7} The "agricultural use" exemption grants qualifying owners "a dramatic taxbreak." *County of Bernalillo v. Ambell*, 94 N.M. 395, 395, 611 P.2d 218, 218 (1980). Entitlement to this taxbreak is premised upon proof that the applicant primarily puts his property to agricultural use. *See* NMSA 1978, § 7-36-20(A) (1973, prior to 1997 amendment) ("[T]he owner of the land ... must produce objective evidence of bona fide agricultural use[.]"). This showing is the applicant's burden. *See id.* The parties disagree as to whether this burden was satisfied on the record presented. Whether they have met their burden depends on the scope attributed to the phrase "bona fide agricultural use" as that phrase is defined by both statute, *see id.*, and regulation, *see* 3 NMAC 6.5.27.1.1 (1983); *see also* § 7-36-20(C)(delegating to agency authority to promulgate implementing regulations). We discuss each in turn.

(A) *The Statutory Provision*

{8} We begin our analysis with a question of law: what is the appropriate construction of the "agricultural use" exemption's unambiguous statutory provision? *See Romero Excavation & Trucking, Inc. v. Bradley Constr.*, 121 N.M. 471, 473, 913 P.2d 659, 661 (1996); *see also Draper v. Mountain States Mut. Cas. Co.*, 116 N.M. 775, 777, 867 P.2d 1157, 1159 (1994) ("If the language of the statute is clear and unambiguous, it is to be given effect[.]"). Our responsibility in this task is "to search for and effectuate the legislative intent—the purpose or object—underlying the statute." *State ex rel. Helman v. Gallegos*, 117 N.M. 346, 353, 871 P.2d 1352, 1359 (1994). We determine, and the parties do not contest, that our interpretation

of Section 7–36–20 is governed by the plain meaning of the statutory language. *See Key v. Chrysler Motors Corp.*, 1996–NMSC–038, 121 N.M. 764, 768–69, 918 P.2d 350, 354–55; *Cummings v. X–Ray Assoc.*, 1996–NMSC–035, ¶ 44, 121 N.M. 821, 918 P.2d 1321. We therefore begin with the statute's plain language.

{9} Section 7–36–20(A) provides:

The value of land used primarily for agricultural purposes shall be determined on the basis of the land's capacity to produce agricultural products. The burden of demonstrating primary agricultural use is on the owner of the land, and he must produce objective evidence of bona fide agricultural use for the year preceding the year in which application is made for his land to be valued under this section. The fact that land was devoted to agricultural use in the preceding year is not of itself sufficient when there is evidence that the agricultural use was subordinate to another use or purpose of the owner, such as holding for speculative land subdivision and sale, commercial use of a nonagricultural character, recreational use or other nonagricultural purpose.

Taxpayers advocate a broad reading of "agricultural use" in this provision. For example, they refer the Court to common definitions of "agriculture" and "use." *See, e.g., Webster's Third International Dictionary* 44 (defining "agriculture" as "the science or art of cultivating the soil, harvesting crops, and raising livestock ... production of plants and animals useful to man and in varying degrees the preparation of these products for man's use and their disposal (as by marketing)"); *see id.* at 2523 (defining "use" as "the act or practice of using something ... continued exercise or employment ... habitual or customary practice: accustomed or usual procedure"). They further point to the statute's subsequent definition of "agricultural use" and argue that it should be given meaning broad enough to encompass their uses of the subject properties. *See* § 7–36–20(B) (defining "agricultural use" as "use of land for the production of plants, crops, trees, forest products, orchard crops, livestock, poultry, or fish").

{10} Adoption of Taxpayers' construction, however, would effectively expand Section 7–36–20 to entitle owners of residential, yet pastoral, lands generally to its generous tax relief. Such a broad interpretation of the statute, we believe, would obviate the need for application of the TRD regulation. Additionally, this oversimplified and incomplete construction is inconsistent with the plain language of the statute. *See State v. Anaya*, 1997–NMSC–010, ¶ 29, 123 N.M. 14, 933 P.2d 223 ("We are distrustful of any formulaic approach in our efforts to facilitate and promote legislative purpose.").

{11} Furthermore, Taxpayers give short shrift to additional statutory language. Notably, it is not merely "agricultural use" which qualifies a property under this provision, but "*bona fide* agricultural use." Section 7–36–20(A) (emphasis added); *see Webster's Third International Dictionary* 250 (defining "bona fide" as "made in good faith without fraud or deceit ... made with earnest or wholehearted intent ... not specious or counterfeit"). Moreover, these bona fide uses must be the "*primary*" uses to which the owner puts the land. Section 7–36–20(A) (emphasis added); *see Webster's Third International Dictionary* 1800 (defining "primary" as "something that stands first in order, rank or importance: FUNDAMENTAL"); *see also AT & T Technologies, Inc. v. Limbach*, 71 Ohio St.3d 11, 13, 641 N.E.2d 177, 178 (1994) (" 'Primary use' connotes primacy in utility or essentiality, in quality as well as quantity."). Taxpayers' construction avoids these explicitly narrowing terms.

{12} We note also that the Legislature distinguished bona fide agricultural uses from other, nonqualifying uses. *See* § 7–36–20(A) (including in definition of nonqualifying uses "holding for speculative land subdivision and sale, commercial use of a nonagricultural character, recreational use or other nonagricultural purpose"). Giving meaning to Section 7–36–20 as a whole, and rejecting Taxpayers' piecemeal approach, we therefore determine that the provision's plain terms contradict Taxpayers' argument.

█ {13} Finally, reading the provision more closely than do Taxpayers, we find that Section 7–36–20 evinces a legislative intent to

deny tax relief to those who demonstrate mere passive or incidental cultivation of their lands. *See Doña Ana Savings & Loan Assoc. v. Dofflemeyer*, 115 N.M. 590, 592, 855 P.2d 1054, 1056 (1993) ("In interpreting a statute, a court not only looks to the plain meaning of the language employed, but also to the object of the legislation."); *Ambell*, 94 N.M. at 397, 611 P.2d at 220 ("It is clear that the legislative intent behind this special method of property tax valuation is to aid the small subsistence farmers in our state."). Accordingly, we reject Taxpayers' construction of the "agricultural use" exemption's statutory provision.

### (B) *The Regulatory Provision*

■ {14} The Taxation and Revenue Department (TRD) promulgated a regulation to implement the "agricultural use" exemption in 1983. *See* 3 NMAC 6.5.27.1.1. This regulation provides:

A. The owner of the land bears the burden of demonstrating that the use of the land is primarily agricultural. This burden cannot be met without submitting objective evidence that:

1. the plants, crops, trees, forest products, orchard crops, livestock, poultry or fish which were produced or which were attempted to be produced through use of the land were:

(a) produced for sale or home consumption in whole or in part; or

(b) used by others for sale; or

(c) used, as feed, seed, or breeding stock, to produce other such products which other products were to be held for sale or home consumption.

2. The use of the land met the requirements for payment or other compensation pursuant to a soil conservation program under an agreement with an agency of the federal government.

3 NMAC 6.5.27.1.1. Taxpayers claim that because Section 7–36–20(B) already defines "agricultural use," TRD cannot further attempt to define the term by regulation. Specifically, Taxpayers argue that the regulation's requirement that anything produced on or from the land be produced for sale, com-mercial use, or home consumption, *see* 3 NMAC 6.5.27.1.1(a-c), is *ultra vires*. We do not agree.

■ {15} TRD acted within its expressly delegated power in promulgating Regulation 3 NMAC 6.5.27.1.1. *See* NMSA 1978, § 7–36–20(C) ("The department shall adopt regulations for determining whether or not land is used primarily for agricultural purposes."). The parties have failed to demonstrate that TRD's exercise of this expressly delegated legislative power is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron, USA, Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *see also Howell v. Heim*, 118 N.M. 500, 504, 882 P.2d 541, 545 (1994) (noting that agency's power to craft rules and regulations is not strictly limited to the terms of its enabling act, "but also includes those powers that arise from the statutory language by fair and necessary implication").

{16} Despite Taxpayers' challenge to this regulation, we find that 3 NMAC 6.5.27.1.1 is consistent with the statute's manifest intent. Indeed, as Taxpayers note, Section 7–36–20(B) provides a definition of "agricultural use." The regulations, in turn, provide objective standards by which to determine if any claimed "agricultural use" further satisfies the statute's requirements of "bona fide" and "primary" use. In other words, the regulations provide a reasonable means for determining whether a claimed agricultural use is actually "subordinate to another use or purpose of the owner." Section 7–36–20(A).

{17} Moreover, we note that TRD adopted this regulation in 1983. Taxpayers point to the Legislature's rendering 3 NMAC 6.5.27.1 .1 obsolete by amending Section 7–36–20 in 1997. *See* NMSA 1997, § 7–36–20(A) (1997). However, this 1997 amendment is no evidence of the Legislature's intent in passing the original statute in 1975. We note that for approximately fifteen years, the Legislature, which is presumed to have known of the regulation's existence and effect, *see Moore v. California State Bd. of Accountancy*, 2 Cal.4th 999, 9 Cal.Rptr.2d 358, 831 P.2d 798, 809 (1992) ("[A] presumption that the Legislature is aware of an administrative construction of a statute should

be applied if the agency's interpretation of the statutory provisions is of such longstanding duration that the Legislature may be presumed to know of it."); *see also Ruch v. Wilhelm*, 352 Pa. 586, 43 A.2d 894, 904 (1945) (noting when a legislature authorizes an agency to promulgate regulations, it "is presumed to know what rules were extant pursuant to that authority"), apparently accepted it as valid and consistent with the previous Section 7–36–20, *see Morris v. Prince George's County*, 319 Md. 597, 573 A.2d 1346, 1354 (1990) (holding that longstanding legislative acquiescence to administrative construction of statute "gives rise to a strong presumption that the interpretation is correct" (quoting *Sinai Hosp. v. Department of Employment and Training*, 309 Md. 28, 522 A.2d 382, 391 (1987))); *cf. In re Morrow's Will*, 41 N.M. 117, 130, 64 P.2d 1300, 1308 (1937) (noting legislative inaction indicates acquiescence to judicial interpretation). Therefore, we determine that TRD's promulgation of 3 NMAC 6.5.27.1.1 was a legal exercise of delegated legislative authority. *See generally Howell*, 118 N.M. at 504–05, 882 P.2d at 545–46.

*TAXPAYERS' ESTOPPEL ARGUMENT*

{18}   Having reviewed the relevant statutory and regulatory provisions, we address Taxpayers' claim that since no use of the subject lands has changed and the county assessor has consistently granted Section 7–36–20 exemptions for the past several years, Taxpayers' properties are entitled to a presumption of primary agricultural use. *See High Ridge Hinkle Joint Venture v. City of Albuquerque*, 119 N.M. 29, 42, 888 P.2d 475, 488 (Ct.App.1994) (noting that "an unexplained reversal of previous [administrative] interpretation or consistent practice" generally merits little deference of a reviewing court).

■ {19}   Taxpayers' argument appears to be one of estoppel. They argue that the Assessor has consistently interpreted the "agricultural use" exemption in Taxpayers' favor; therefore, it should be estopped from changing its interpretation absent some change in circumstances. We do not agree.

■ {20}   The Bernalillo County Assessor "is not disqualified from changing its mind." *NLRB v. Iron Workers*, 434 U.S. 335, 351, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978). While dramatic shifts in administrative interpretation of law generally entitle a new agency interpretation "to considerably less deference," *INS v. Cardoza–Fonseca*, 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (quoting *Watt v. Alaska*, 451 U.S. 259, 273, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981)), this rule does not preclude an agency from correcting its mistakes, *see Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993) ("The Secretary is not estopped from changing a view she believes to have been grounded upon a mistaken legal impression.") (citing *Automobile Club of Mich. v. Commissioner*, 353 U.S. 180, 183, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957) (holding that federal tax authority could retroactively revoke prior ruling granting taxpayer an exemption where prior ruling was erroneously granted)).

{21}   The Assessor has provided justification for the change in application of Section 7–36–20 to Taxpayers. As the Assessor noted, 1996 was the first year in the immediate past wherein it had the resources to conduct thorough site investigations and verifications of Section 7–36–30 applications. Accordingly, the Assessor appears not to be arbitrarily deviating from prior practice and procedure as much as it is now doing a more capable and competent job of administering its office according to the applicable law. This is not grounds for reversing the appealed administrative decisions.

{22}   Furthermore, in this regard, the structure and language of the statute itself limits the weight to be afforded prior issuances of "agricultural use" exemptions. For example, under the statute in force at all times relevant to these appeals, it was Taxpayers' burden to demonstrate primary agricultural use *each* year. *See* NMSA 1978, § 7–36–2(A) (prior to 1997 amendment). Qualification for the exemption during prior years, therefore, is not dispositive of the question of entitlement for the 1996 tax year. *See id.* While such evidence has persuasive force, it is rebutted if "there is evidence the

agricultural purpose was subordinate to another use or purpose of the owner." *Id.* Accordingly, the law regulating issuance of "agricultural use" exemptions for the tax year at issue leaves ample room for detailed annual review of applications.

## TAXPAYERS ARE NOT ENTITLED TO SECTION 7–36–20 EXEMPTIONS FOR THE 1996 TAX YEAR

{23} We now turn to the facts on appeal. In reviewing the record presented, we must determine whether the Board's decision was "supported by substantial evidence or whether the decision is arbitrary, unlawful, unreasonable, or capricious." *In re Protest of Cobb,* 113 N.M. 251, 253, 824 P.2d 1053, 1055 (Ct.App.1991). In making this determination, we will not substitute our own judgment. *See Herman v. Miners' Hosp.,* 111 N.M. 550, 552, 807 P.2d 734, 736 (1991). Rather, we review the whole record below and will uphold the Board's decision if we "find evidence that is credible in light of the whole record and that is sufficient for a reasonable mind to accept as adequate to support the conclusion reached by the agency." *Id.* "[A]lthough the evidence may support inconsistent findings, we will not disturb the agency's finding if supported by substantial evidence on the record as a whole." *Id.; see also Plaza del Sol v. Bernalillo County Assessor,* 104 N.M. 154, 161, 717 P.2d 1123, 1130 (Ct.App.1986) (noting that county tax board decision will be "viewed in the light most favorable to support the findings"). Finally, even under the whole record review employed here, we will afford deference to the fact finder below. *See Herman,* 111 N.M. at 552, 807 P.2d at 736.

{24} Review of a taxpayer's application for an "agricultural use" exemption will necessarily implicate, as the Board correctly noted, consideration of "all the facts and circumstances with respect to the subject property during the relevant period . . . as a whole to determine if the primary use of the subject property is agricultural or something else." As a group, Taxpayers allege primary agricultural use of their properties and entitlement, therefore, to the "agricultural use" exemption. In making their argument, Taxpayers adduced evidence regarding their: (1) grazing horses; (2) growing grasses, fruit trees and vegetable gardens; and (3) qualifying for participation in a federal soil conservation program. The Board found that this evidence was insufficient to support Taxpayers' claims to the entitlement. We agree.

### (A) Crops Produced for Sale or Home Consumption

{25} First, we find that the Board's conclusion that Taxpayers were not primarily employing their properties to produce crops within the meaning of the law is supported by the record. Taxpayers argue that growing various agricultural grasses, vegetables, fruit and nuts constitutes producing crops and therefore qualifies as "agriculture" under Section 7–36–20. In support, Taxpayers cite to *Black v. Bernalillo County Valuation Protests Board,* 95 N.M. 136, 139, 619 P.2d 581, 584 (Ct.App.1980), to argue that alfalfa is an agricultural product, and therefore, by extension, their properties are agricultural lands. This argument fails.

{26} The taxpayer in *Black* grazed more than 350 head of cattle on his property and earned "no income from any source other than agriculture." *Black,* 95 N.M. at 138–39, 619 P.2d at 583–84. It was in light of these facts that the Court found him entitled to the "agricultural use" exemption. The language in *Black* upon which Taxpayers rely merely provides a generic definition of alfalfa. As such, it provides no analytical support for their argument: agricultural lands grow alfalfa therefore lands that grow alfalfa are agricultural.

{27} Moreover, while growing alfalfa, fruits, nuts, and vegetables may constitute producing crops, the regulations further require that "plants, crops, . . . orchard crops . . . which were produced . . . were: (a) produced *for* sale or home consumption; or (b) used by other for sale[.]" 3 NMAC 6.5.27.1.1 (emphasis added). As the Board noted, this language requires more than merely passive or incidental activity. Rather, it requires evidence of intent to produce a crop. No Taxpayer produced objective evidence on this point.

{28} For example, the Duncans testified that they gave away the grass they paid someone to cut each year. The Alexanders claim to have sold "a portion" of the alfalfa which originally grew on their property, but they adduced no evidence of any attempt to sell hay or grass in 1995. On the record presented, the primary consumers of Moseley's fruits and nuts appear to be the birds. Finally, the Board, acting as a trier of fact, found that any sale of the Geretys' grass was "insignificant." We cannot fairly construe this record as satisfying Taxpayers' burden to demonstrate an intent to produce a crop. In so concluding, however, we wish to make clear that we do not read the subject provisions as requiring proof of actual sales. All that an applicant is required to demonstrate is an objective intent to produce a crop for sale or home consumption.

{29} Second, we affirm the Board's finding that the grazing of recreational horses on Taxpayers' property does not satisfy the regulatory provision for "home consumption." Taxpayers attempt, on this point, to equate "consumption" with "use." Accordingly, their "use" of grasses by feeding it to their horses, they argue, constitutes "home consumption" within the meaning of 3 NMCA 6.5.27 .1.1(a). We disagree. Such logic deprives the regulation of any meaning. First, the proposed interpretation means virtually any use of, for example, plants would qualify a property owner to an "agricultural use" exemption. Thus, a residential property owner, who "uses" for aesthetic purposes his front lawn or xeriscaped yard, could legitimately claim "home consumption" and entitlement to this tax break. Second, such expansive reading of subsection (a) renders subsections (b) and (c), which further provide for specific qualifying uses, mere surplusage. For example, 3 NMCA 6.5.27.1.1(c) provides for crops which are "used, as feed[.]" If we were to accept Taxpayers' proposed definition of "home consumption" as meaning any "use" of crops occurring at or near the home, the regulation's latter provision for "use" of crops as "feed" would be redundant. Accordingly, we reject the argument. See Regents of the Univ. of New Mexico v. Fed'n of Teachers, 1998–NMSC–020, ¶ 21, 125 N.M. 401, 962 P.2d 1236.

{30} We hold instead that the Board appropriately applied subsection (c) to Taxpayers' claimed grazing uses. Taxpayers did indeed feed crops to their horses. However, the regulation imposes the further requirement that "feed" uses of crops be intended "to produce . . . other products . . . to be held for sale or home consumption." 3 NMCA 6.5.27.1.1(c). The Board interpreted this language in a manner consistent with its reading of subsection (a); that is, it interpreted the regulation as requiring any livestock fed by crops grown on a Taxpayer's property to have been intended for sale or food. Taxpayers failed to produce evidence of such intent.

(B) *Participation in Federal Soil Conservation Program*

{31} The Geretys argued that their property qualified for participation in a federal soil conservation program and that they were therefore entitled to an "agricultural use" exemption. *See* 3 NMAC 6.5.27.1.1 (providing that land which "met the requirements for payment or other compensation pursuant to a soil conservation program under an agreement with an agency of the federal government" qualifies as land used primarily for agricultural purposes). The Board found that they failed to prove participation in any program, and we agree. The regulatory language implies a prerequisite "agreement with an agency of the federal government." *Id.* The Geretys demonstrated no such agreement.

{32} The Geretys did present evidence showing that their land potentially qualified for participation in a USDA administered soil conservation program. However, they tendered no evidence indicating that they had taken advantage of this opportunity. For example, they introduced a letter from the USDA's National Resources Conservation Service informing them that their "farm along with the others that would be benefited from this improved irrigation water conveyance system are eligible for technical assistance[.]" However, the letter further notes that the USDA wrote only in regard to "the *option* of constructing a plastic irrigation

pipeline[.]" (Emphasis added.) They further provided evidence that in 1994 they commissioned a study investigating the feasibility of exercising this option. However, as of June 1996, they had not exercised this option nor had they become members of the local soil and water conservation district. As of that date, they had not procured their neighbors' signatures on a cooperative "pooling agreement" regarding the potential pipeline, a prerequisite to implementing the proposed project. Accordingly, the record does not demonstrate that they had a soil conservation agreement with the USDA, and they are not, therefore, entitled to an 'agricultural use' exemption per 3 NMAC 6.5.27.1.1.2.

## CLAIMED DISCOVERY AND EVIDENTIARY VIOLATIONS

{33} The Duncans further claim prejudicial procedural error below. However, we find that this argument has no merit.

{34} They first claim error in the Board's failure to issue sanctions for the Assessor's alleged refusal to respond to a discovery request. *See* Rule 1–034 NMRA 1998. The Duncans made the discovery request in a letter dated October 22, 1996. Rule 1–034(B) mandates compliance with such requests within thirty days. The Board convened the hearing on November 8, 1996, and as of that time, the Assessor had not responded to the request. Nonetheless, the Duncans rejected the Board's suggestion of a continuance. The Board, finding that they had failed to show a violation of the rule, then declined to issue sanctions. Upon these facts, we find no error in the Board's ruling. *See Smith v. FDC Corp.*, 109 N.M. 514, 523, 787 P.2d 433, 442 (1990)("The choice of sanctions [for discovery violations] lies within the discretion of the trial court, and it will be reversed only for an abuse of discretion."); *see also Sims v. Sims*, 1996–NMSC–078, ¶ 65, 122 N.M. 618, 930 P.2d 153 ("An abuse of discretion occurs when a ruling is clearly contrary to the logical conclusions demanded by the facts and circumstances of the case.").

{35} The Duncans next claim error in the Board's exclusion of an affidavit alleging bias on the part of the Assessor. At the hearing, the Assessor objected to the affidavit, claiming it was hearsay and prejudicial. After hearing the parties' arguments, the Board sustained the objection and refused to admit the affidavit, taking notice of it instead. We see no basis for holding that the Board abused its discretion in so ruling. *See State v. Aguayo*, 114 N.M. 124, 128, 835 P.2d 840, 844 (Ct.App.1992) ("Admission of evidence is within the sound discretion of the trial court and the trial court's determination will not be disturbed in the absence of an abuse of that discretion."). The affidavit was hearsay. Moreover, the Duncans already had available a witness who had attended the same meeting upon which the affidavit was based. Moreover, they failed to show why the affiant could not be called to testify in person. Accordingly, we find no error in the Board's ruling.

## CONCLUSION

{36} Because of the great potential for abuse, tests for determining whether property qualifies as used primarily for agricultural purposes must be objective to the extent possible. In each case, the Taxpayers put their lands to something less than "bona fide agricultural use," the narrow standard imposed by statute and regulation. For the reasons discussed above, we determine that the Board could reasonably determine that Taxpayers failed to meet their burden of showing primary agricultural use of their properties. We further determine that the Board's decision as to each taxpayer is supported by substantial evidence. We accordingly affirm the decision of the Bernalillo County Valuation Protests Board as to each Taxpayer.

{37} **IT IS SO ORDERED.**

APODACA and BOSSON, JJ., concur.