2004-NMCA-055

92 P.3d 642

**JICARILLA APACHE NATION,**
**Plaintiff–Appellant,**

v.

**RIO ARRIBA COUNTY ASSESSOR, Arthur Rodarte, in his official capacity only, Defendant–Appellee.**

**No. 22,336.**

Court of Appeals of New Mexico.

June 9, 2003.

Certiorari Granted, No. 28,128,
July 15, 2003.

Wayne H. Bladh, Nordhaus, Haltom, Taylor, Taradash & Bladh, L.L.P., Santa Fe, NM, Daniel I.S.J. Rey–Bear, Stephen H. Greetham, Nordhaus, Haltom, Taylor, Taradash & Bladh, L.L.P., Albuquerque, NM, for Appellant.

Dennis Luchetti, Ted J. Trujillo, Española NM, for Appellee.

Richard B. Cole, Alfred A. Park, Keleher & McLeod, P.A., Albuquerque, NM, for Amicus New Mexico Elk Producers Association.

## OPINION

FRY, Judge.

{1} Appellant Jicarilla Apache Nation (the Nation) appeals a decision by the Rio Arriba County Valuation Protests Board (the Board), affirming in relevant part a June 2000 amended notice of valuation issued by the Rio Arriba County Assessor (the Assessor), for a 32,075.8–acre property known as the Lodge at Chama (the Ranch). We consider the statutes and regulations governing the special mode of valuation for agricultural property and conclude that the Board's interpretation of this law was erroneous. We reverse the Board's determination.

## BACKGROUND

{2} The Ranch is a 32,075.8–acre property located near Chama, New Mexico, formerly known as the "Chama Land and Cattle Company." The name was changed to the "Lodge at Chama" in 1989 or 1990. The Nation purchased the Ranch in 1995. In 1996, and in all subsequent years through 1999, the Assessor valued 32,061 acres of the Ranch as agricultural land and imposed ad valorem livestock taxes on the Nation's private elk herd. In June 2000 the Assessor issued an amended notice of valuation that revoked the Ranch's long-standing agricultural-use classification, reclassified the property as "miscellaneous non-residential," and assessed its full value at $21,301,191, which constituted nearly a ten-fold increase over the 1999 tax year value. The Assessor gave three reasons for its reclassification: (1) privately owned elk are not "livestock," (2) the primary use of the Ranch had changed to non-agricultural, and (3) non-agricultural income at the Ranch exceeded agricultural revenues.

{3} The Nation protested the amended valuation, and the Assessor requested a hearing before the Board. Prior to the hearing, the Nation and the Assessor resolved several matters by stipulation. Among other things, the parties stipulated to the valuation of the westernmost 5,035 acres of the ranch: 5,000 acres are subject to a grazing lease and are considered agricultural land; 20 acres qualify as irrigated agricultural land; 11 acres are valued as miscellaneous land; and the remaining 4 acres upon which the actual lodge and various residences are located are also valued as non-agricultural land. The parties agreed that the only issue before the Board was "whether the remaining 27,040.80 acres ... should be classified and valued as agricultural land." They also stipulated that, "since at least 1996, the County [had] issued annual notices of property valuation recognizing 32,061 acres of the [Ranch] as used primarily for agricultural purposes."

{4} The Nation introduced the testimony of Frank Y. Simms, the president and general manager of the Ranch, who has been with the Ranch since 1990. He described the Nation's activities on the Ranch as being "livestock grazing and related elk production," timber production, a commercial lodge, and recreational use.

{5} The Nation grazes a private elk herd on 6400 acres of the disputed property, and from 1996 to 1999 the Nation paid livestock taxes on the herd. The private herd has been at the Ranch for more than forty years. The Nation extensively manages the 6400 acres by irrigating to produce feed, and it subjects the private herd to a rigorous genetic improvement breeding program. The elk are then harvested through organized hunts, although some elk are sold commercially to other farms. Hunt packages, which include food, lodging, and guide services, cost each hunter between $5,500 and $13,000. Ninety-nine percent of the hunters who harvest elk at the Ranch take the entire animal with them in the form of cut, wrapped, and frozen meat, and ninety-eight percent have the animal mounted.

{6} The Nation manages the remaining portion of the disputed property "for the production, quality, and health of the wild elk herd there." This management includes manipulation of the Nation's timber stand to maximize the production of forage for the wild herd. The Nation then sells permits, obtained via contract from the State, to hunters who harvest elk that are part of the wild herd.

{7} At the conclusion of the hearing, the Board affirmed the Assessor's valuation and concluded that "the use of that property is primarily as a habitat for elk, [and] that all

other uses, including arguably agricultural uses, are secondary and incidental to that primary use." Because the Board concluded that elk are not "livestock" for purposes of the Property Tax Code (the Code), NMSA 1978, §§ 7–36–1 to –33 (1973, as amended through 2001), it also concluded that the use of the Ranch primarily for elk habitat "does not pass muster as land used primarily for agricultural purposes under [Section 7–36–20]."

{8} The Board found that the Assessor first learned in November 1999 about the Nation's "new business plans and goals and income information" for the Ranch via a letter to the Nation's president from the acting regional director of the Bureau of Indian Affairs (BIA). This letter constituted the BIA's evaluation of the Nation's request that the Ranch be conveyed to the United States to hold in trust for the Nation. The Board found that this letter along with internet websites advertising the Ranch as a "recreational retreat[ ]" supported the Assessor's determination that the Ranch was used primarily for non-agricultural purposes.

{9} The Board further found that, although the Ranch's timber and grazing activities were bona fide agricultural uses, the Ranch's other activities, such as fishing, elk hunting, and skeet-shooting, were non-agricultural. In addition, the Board found that the Nation's soil conservation agreement with the United States Department of Agriculture (USDA) had, "as its primary purpose, the development and maintenance of a habitat suitable for the maintenance of elk," and that a significant portion of the Ranch was used for producing elk for big game hunting. Thus, because the Board found that elk are not "livestock," it found that the Ranch's primary activities did not constitute agricultural use as defined by Section 7–36–20(B). The Board also found that the Ranch's non-agricultural income exceeded its agricultural income.

{10} The Nation appealed the Board's decision to the district court and filed a motion asking the district court to certify the appeal to this Court. The district court granted the motion and we accepted certification.

## DISCUSSION
### Certification

{11} We asked the parties to address whether this Court has the discretion to set aside the district court's certification order. The trial court certified this case under NMSA 1978, § 39–3–1.1(F) (1999), a subsection of the statute governing judicial review of certain agency final decisions, which provides as follows:

> The district court may certify to the court of appeals a final decision appealed to the district court, but undecided by that court, if the appeal involves an issue of substantial public interest that should be decided by the court of appeals. The appeal shall then be decided by the court of appeals.

For the reasons that follow, we find that the district court properly certified this case as invoking issues of substantial public interest. We also find that the statutory language "shall then be decided" plainly requires this Court to decide the appeal. *See* NMSA 1978, § 12–2A–4(A) (1997). *See also High Ridge Hinkle Joint Venture v. City of Albuquerque,* 1998–NMSC–050, ¶ 5, 126 N.M. 413, 970 P.2d 599 (recognizing that "plain language of a statute is the primary indicator of legislative intent") (internal quotation marks and citation omitted).

{12} An issue of "substantial public interest" necessarily affects entities beyond the parties themselves. Moreover, both common sense and case law suggest that an issue is one of "substantial public interest" when it raises a question of first impression that is likely to recur, and when the need for uniformity is great. Although we are not aware of case law interpreting Section 39–3–1.1(F), we find support for our view in Supreme Court decisions accepting certification from this Court on questions of first impression. *See, e.g., Sunwest Bank of Albuquerque v. Nelson,* 1998–NMSC–012, ¶ 13, 125 N.M. 170, 958 P.2d 740 (accepting certification to resolve as a matter of first impression whether "a national banking association ... [was] a resident of New Mexico for purposes of venue selection"); *Carmona v. Hagerman Irrigation Co.,* 1998–NMSC–007, ¶ 6, 125 N.M. 59, 957 P.2d 44 (accepting certification to

clarify application of attractive nuisance doctrine to owners and operators of irrigation ditches).

{13} In this case, the Nation presented evidence that the Assessor's application of Section 7–36–20 differed from the approach of nine other county assessors. As Amicus New Mexico Elk Producers points out, the application of Section 7–36–20 affects elk production enterprises throughout the state. We agree with the Nation and Amicus that the classification and valuation of agricultural land under the Code presents issues of substantial public importance because of the effects on elk farmers statewide. The question is likely to recur with respect to other elk producers in other counties, and the public has an interest in uniform application of the Code provisions designed by the legislature to benefit agricultural land users. Accordingly, we find that the trial court correctly identified this issue as one of substantial public interest. Because the trial court properly certified the issue to us, we are statutorily required to address the appeal.

### The Parties' Arguments on the Merits

{14} The Nation makes one primary argument and several sub-arguments in support of its view that the Board erred in upholding the Assessor's decision to reclassify the Ranch as non-agricultural. The Nation's main argument is that the use of the property has been consistent and ongoing since the Nation acquired the property, and the Assessor has always classified the property as agricultural. Therefore, it argues, because the Nation has always used the property to produce agricultural products and it has not changed its use of the property in any way since it acquired ownership, the Board's decision upholding the change in classification is unsupported by substantial evidence, arbitrary and capricious, and contrary to law.

{15} The crux of the parties' dispute, and the focus of the Nation's sub-arguments, is whether the Nation's primary use of the Ranch is indeed "agricultural use" as that term is defined by statute, regulation, and case law. The Nation contends that its present use of the Ranch is agricultural because: (1) pursuant to the Code, the soil conserva-

tion agreement between the Nation and the USDA constitutes agricultural use; (2) the Nation's active management of the Ranch to produce elk and the feed and habitat necessary to support elk all constitute the agricultural use of the land, either because elk are "livestock" or because the food, hide, pelts, and other by-products of the elk are agricultural products; and (3) although it is problematic to rely on income in order to determine use, the Ranch's income, if calculated properly, is primarily agricultural.

{16} The Assessor contends that the prior valuation of the Ranch as agricultural property was a mistake due to the Assessor's unfounded understanding that elk are "livestock" as that term is used in the Code. Because the Assessor learned at a training session that the Department of Taxation and Revenue does not consider elk to be livestock, and because the Ranch's primary focus is the breeding and support of elk, it would be a mistake to continue to view the Nation's use of the Ranch as agricultural. In addition, the Assessor claims that the BIA letter and the Ranch's website suggested that the use of the Ranch had changed from a ranch-type property to a recreational luxury resort. Finally, although some activities conducted by the Ranch were bona fide agricultural activities, the primary use of the Ranch was non-agricultural, as evidenced by the Ranch's income for the previous three years. The Board affirmed the Assessor's change in valuation, and the Assessor claims the Board's decision is supported by substantial evidence and consistent with law.

### Standard of Review

{17} We review the Board's decision to determine whether it is "supported by substantial evidence or whether the decision is arbitrary, unlawful, unreasonable, or capricious." *Alexander v. Anderson*, 1999–NMCA–021, ¶ 23, 126 N.M. 632, 973 P.2d 884 (internal quotation marks and citation omitted). While we do not substitute our own judgment for that of the Board's, *id.*, we are not bound by the Board's interpretation of the applicable law. *Rio Grande Chapter of the Sierra Club v. N.M. Mining Comm'n,*

2003–NMSC–005, ¶ 13, 133 N.M. 97, 61 P.3d 806.

### Presumption of Correctness

█ {18} We initially address a procedural issue underlying this appeal. Pursuant to Section 7–36–20(A) and the parties' stipulation, the protest hearing commenced with the presumption that the Ranch continued to be entitled to the agricultural use method of valuation. *See* § 7–36–20(A) ("If the land was valued under this section in one or more of the three tax years preceding the year in which the determination is made and the use of the land has not changed since the most recent valuation under this section, a presumption is created that the land continues to be entitled to that valuation."). As a result of this presumption, the Assessor had the burden of proof. The Board concluded that the Assessor met this burden at the close of its case-in-chief and overcame the presumption favoring the Nation. The Board concluded that at this point NMSA 1978, § 7–38–6 (1981), conferred on the Assessor's valuation a "statutory presumption of correctness" and the burden of proof shifted to the Nation to overcome that presumption. We conclude that the Board incorrectly determined that Section 7–38–6 had any applicability in this case. Section 7–38–6 provides:

> Values of property for property taxation purposes determined by the division or the county assessor are presumed to be correct. Determinations of tax rates, classification, . . . and the computation and determination of property taxes made by the officer or agency responsible therefor under the Property Tax Code . . . are presumed to be correct.

In *Black v. Bernalillo County Valuation Protests Bd.*, 95 N.M. 136, 141, 619 P.2d 581, 586 (Ct.App.1980), we held this presumption to be applicable only to the value of property and inapplicable when the question is whether a taxpayer "is entitled to the special method of valuation provided for in § 7–36–20." The present case concerns this precise question, and consistent with *Black*, we hold that Section 7–38–6 is not applicable. Accordingly, there is no statutory presumption that the

Assessor's valuation is correct, nor has the burden of proof shifted to the Nation.

### Section 7–36–20  Special Method of Valuation for Land Used Primarily for Agricultural Purposes

{19} The statute governing the issues in this appeal provides in relevant part:

> A.  The value of land used primarily for agricultural purposes shall be determined on the basis of the land's capacity to produce agricultural products. Evidence of bona fide primary agricultural use of land for the tax year preceding the year for which determination is made of eligibility for the land to be valued under this section creates a presumption that the land is used primarily for agricultural purposes during the tax year in which the determination is made. If the land was valued under this section in one or more of the three tax years preceding the year in which the determination is made and the use of the land has not changed since the most recent valuation under this section, a presumption is created that the land continues to be entitled to that valuation.
>
> B.  For the purpose of this section, "agricultural use" means the use of land for the production of plants, crops, trees, forest products, orchard crops, livestock, poultry or fish. The term also includes the use of land that meets the requirements for payment or other compensation pursuant to a soil conservation program under an agreement with an agency of the federal government.

§ 7–36–20(A)(B).

{20} We last addressed the agricultural method of property valuation in *Alexander*, where we interpreted Section 7–36–20. Although the legislature rewrote the burden-of-proof portions of the statute after *Alexander* was decided, 1997 N.M. Laws ch. 162, § 1, the requirements for agricultural valuation remain the same: the land must be primarily used for bona fide agricultural purposes. Section 7–36–20(B) expressly defines "agricultural use" as "the use of land for the production of plants, crops, trees, forest products, orchard crops, livestock, poultry or fish . . . [and] the use of land that meets the

requirements for payment or other compensation pursuant to a soil conservation program under an agreement with an agency of the federal government." *Alexander* made it clear that the enumerated uses of the subject property must be "bona fide agricultural use[s]" and the "primary uses" of the property in order to qualify for the special method of valuation. *Alexander*, 1999–NMCA–021, ¶¶ 11–12, 126 N.M. 632, 973 P.2d 884 (internal quotation marks and citation omitted).

### The Board's Reliance on Section 7–36–15 Was Erroneous

■ {21} The Board relied heavily on the Assessor's analysis of the Ranch's income in concluding that the Ranch was used primarily for non-agricultural purposes. The Board concluded that income analysis was appropriate pursuant to Section 7–36–15(B), which provides that "the value of property for property taxation purposes shall be its market value as determined by application of the sales of comparable property, *income* or cost methods of valuation or any combination of these methods." (Emphasis added.) However, the statute also states that these methods of valuation apply "*[u]nless* a method or methods of valuation are authorized in Sections 7–36–20 through 7–36–33." § 7–36–15(B) (emphasis added). Here we are concerned with Section 7–36–20, which is titled "Special method of valuation; land used primarily for agricultural purposes." Therefore, by its plain terms, the income method set forth in Section 7–36–15 does not apply to land classified as agricultural. Moreover, Section 7–36–20(A) provides that "[t]he value of land used primarily for agricultural purposes *shall be determined on the basis of the land's capacity to produce agricultural products.*" (Emphasis added.) Thus, agricultural land is to be valued based on its capacity to produce, not on its actual production.

{22} Although the method of valuation applicable to agricultural land also provides for an income method of valuation, *see* 3 NMAC 6.5.27(D)(1) (2003), the critical point is that valuation is distinct from classification. The issue in this case is whether the Ranch may properly be classified as agricultural land, not whether it was valued properly for taxa-

tion purposes. It makes no sense to classify property in the first instance by looking to its income potential or value, a step that should not take place until the property has first been classified. *Cf. Black*, 95 N.M. at 141, 619 P.2d at 586 (explaining that valuation of property is distinct from special method of valuation under Section 7–36–20). Thus, we hold that the Board's reliance on the valuation portions of the Code was improper.

{23} We note that the Assessor and the Board expressly did not rely on 3 NMAC 6.5.27(A)(2), other than as indirect support for their reliance on Section 7–36–15. That regulation provides that "[a] presumption exists that land is not used primarily for agricultural purposes if income from nonagricultural use of the land exceeds the income from agricultural use of the land." *Id.* The Assessor and the Board apparently refrained from relying on this presumption because this Court questioned its validity in *Black*, where we noted: "Although we question the authority of the Department to create presumptions of fact by way of regulations, we do not decide the issue because the 'presumption' is not applicable to the facts in this case. There is no income from a nonagricultural use of the land." *Id.* at 141, 619 P.2d at 586. Because the Board did not rely on the regulatory presumption, we need not address it, and we express no opinion regarding the Department's authority to create the presumption or whether the presumption, if valid, would be applicable in this case.

{24} In a related argument, the Assessor relies on *County of Bernalillo v. Ambell*, 94 N.M. 395, 611 P.2d 218 (1980), and argues that the Ranch's relatively large income militates against a finding of agricultural use. In *Ambell*, the Court considered whether a statutory ten percent limit on property tax increases applied to property whose valuation increased because of a change from agricultural to non-agricultural use. *Id.* at 395, 611 P.2d at 218. In holding that the ten percent limit did not apply under such circumstances, the Court noted that "the legislative intent behind this special method of property tax valuation [for land used primarily for agricultural purposes] is to aid the small subsistence

farmers in our state." *Id.* at 397, 611 P.2d at 220. Thus, the Assessor contends that the Nation cannot benefit from Section 7–36–20 because it is not a "small subsistence farmer." We disagree. The statement in *Ambell* is dictum unnecessary to the holding that the ten percent limit did not apply to reclassified land. *See, e.g., Kent Nowlin Constr. Co. v. Gutierrez,* 99 N.M. 389, 390–91, 658 P.2d 1116, 1117–18 (1982). The language in *Ambell* is not "persuasive with regard to the present circumstance." *Moffat v. Branch,* 2002–NMCA–067, ¶ 25, 132 N.M. 412, 49 P.3d 673.

### The Private Elk Herd Is Livestock

■ {25} Aside from its reliance on the Ranch's income figures, the Assessor conceded that many of the Nation's activities were bona fide agricultural uses, such as the Nation's soil conservation agreement with the USDA and its timber management program. However, the Assessor maintained and the Board agreed that these activities were secondary to the Nation's development and maintenance of elk and elk habitat. Therefore, because elk are no longer considered "livestock" under the Code, the Assessor argued that the Nation's bona fide agricultural uses cannot be deemed primary uses and the property cannot enjoy the benefit of agricultural assessment. However, the Assessor's primary witness, Agapito Candelaria, acknowledged that if the Code considered elk to be livestock, then he would change his opinion regarding the non-agricultural use of the property.

{26} In concluding that elk are not livestock, the Board relied on Candelaria's testimony and on "PTD General Order No. 99–25" issued by the director of the Property Tax Department (PTD). In the four years preceding the assessment in question, Candelaria had personally classified the Nation's private elk herd as livestock for purposes of the Code based on his agricultural background and the buying, selling, and trading of elk that the Nation engaged in. However, Candelaria attended a workshop for assessors at which he was told that the Code does not classify elk as livestock. In addition, PTD General Order No. 99–25 lists "value of livestock for property taxation purposes" for tax year 2000 pursuant to Section 7–36–21. The Order does not mention elk.

■ {27} We look first to the Code, because as Candelaria acknowledged, it is only the interpretation of the statutes that might preclude classifying elk as livestock. There is no question that the use of land to produce livestock is an agricultural use. Section 7–36–20(B) (providing that "agricultural use" is "the use of land for the production of plants, crops, trees, forest products, orchard crops, livestock, poultry or fish.") The Code defines livestock as: "cattle, buffalo, horses, mules, sheep, goats, swine, ratites [i.e., ostriches, rheas, and emus] and other domestic animals useful to man." § 7–35–2(C). Because elk are not specifically listed, the question is whether they can be deemed "other domestic animals useful to man."

■ {28} We give effect to a statute's language and refrain from further interpretation when the language is clear and unambiguous. *Sims v. Sims,* 1996–NMSC–078, ¶ 17, 122 N.M. 618, 930 P.2d 153. A "domestic animal" is "any of various animals (as the horse, ox, or sheep) which have been domesticated by man so as to live and breed in a tame condition." Webster's Third New International Dictionary, Unabridged, 671 (1986). The evidence established that the Nation's private elk herd is confined by an eight-foot fence and the animals' breeding is entirely supervised and controlled. We see no meaningful distinction between the tameness of buffalo, which are by statute specifically deemed to be domestic animals, and the tameness of elk under these circumstances. Elk in a private herd are as "useful to man" as buffalo; both produce meat, pelts, and hides. The legislature obviously intended to specify well-known domestic animals as livestock and leave a catch-all category to include those inadvertently overlooked in the specific listing or those animals that ultimately develop through agricultural practice into "domestic animals useful to man." *Compare* 1993 N.M. Laws ch. 166, § 1 (adopting former version of livestock definition that did not include ratites) *with* 1993 N.M. Laws ch. 39, § 1 (amending statute to add ratites to list of animals deemed to be livestock).

638

{29} Both the Assessor and the Board relied on PTD General Order No. 99–25 to support the proposition that elk cannot be classified as livestock. They note that the Order lists many animals for valuation purposes but that elk are notably absent. However, buffalo, mules, and ratites are not mentioned in the Order either, despite their express inclusion in the definition of livestock in Section 7–35–2. Thus, the absence of an animal from the Order cannot be deemed conclusive or even to provide guidance in the interpretation of Section 7–35–2. *See Jones v. Employment Servs. Div.*, 95 N.M. 97, 99, 619 P.2d 542, 544 (1980) ("If there is a conflict or inconsistency between statutes and regulations promulgated by an agency, the language of the statutes shall prevail.").

{30} The Assessor, relying on *State ex rel. Sofeico v. Heffernan*, 41 N.M. 219, 67 P.2d 240 (1936), further argues that it is without the authority to "define" unspecified animals as "other domestic animals useful to man" because the legislature cannot properly delegate to an agency the discretion to establish substantive law. *Id.* at 230–31, 67 P.2d at 246–47. *Sofeico* involved a statute conferring on the State Game Commission the authority to define which animals were "game animals" and to determine hunting seasons and approved methods of hunting. 1931 N.M. Laws ch. 117, § 3. While the Court concluded that only the legislature could define game animals, it also stated that "some situations require the vesting of some discretion in public officials, as, for instance, where it is difficult or impracticable to lay down a definite, comprehensive rule." *Sofeico*, 41 N.M. at 228, 67 P.2d at 245 (citation and internal quotation marks omitted). Section 7–35–2 demonstrates such a situation. The legislature has conferred discretion on assessors to determine what constitutes "other domestic animals useful to man" because, as the situation with ratites illustrates, the types of animals domesticated by man can change over time.

{31} Several years ago ostriches and emus were not typically tamed or raised for human consumption. However, entrepreneurial farmers and ranchers saw the economic potential in marketing ostrich and emu leather and meat and began to domesticate ratites. *See* Captain Brian H. Nomi, *Of Ostriches and Other Ratites—A Claims Saga*, 1996–APR Army Law. 43; Robert Luedeman & Darla Mondou, *Meet the New Meat: Legal Aspects of Ratite Bird Production*, 8 S.J. Agri. L.Rev. 1 (1998). Thus, when the farming of ratites began in earnest in New Mexico, but before the legislature amended Section 7–35–2 specifically to include ratites, assessors would have had the discretion to recognize ratites as "other domestic animals useful to man" and classify them as livestock. Given the inventiveness of human nature and the capitalistic urges of Americans, there is no telling what animal in the future might be considered amenable to profitable domestication. Consequently, it makes sense that the legislature intended to set out broad guidelines for as-yet unclassified livestock.

{32} Because we must read the Code "in connection with other statutes concerning the same subject matter," *Quantum Corp. v. Taxation & Revenue Dep't*, 1998–NMCA–050, ¶ 8, 125 N.M. 49, 956 P.2d 848, we find further support for our reading of Section 7–35–2 in the Livestock Code, which defines livestock as "all domestic or domesticated animals that are used or raised on a farm or ranch, including the carcasses thereof, and exotic animals in captivity and includes horses, asses, mules, cattle, sheep, goats, swine, bison, poultry, ostriches, emus, rheas, camelids and *farmed cervidae* upon any land in New Mexico." NMSA 1978, § 77–2–1.1(A) (2001) (emphasis added). Cervidae are deer, elk, or moose. Webster's, *supra*, 367.

{33} The Assessor contends we should not refer to the Livestock Code because it deals with a subject matter different from the Code. We disagree. The Livestock Code serves "to promote greater economy, service and efficiency in the administration of the laws relating to the livestock industry in New Mexico, to control disease, to prevent the theft or illegal movement of livestock and to oversee the New Mexico meat inspection program." NMSA 1978, § 77–2–1 (1999). The Code obviously provides for the taxation of property. However, simply because the two codes have different broad purposes does

not mean that they do not concern the same subject matter. Both codes address the term "livestock" in some detail, and therefore, we "presume that the legislature did not intend to enact a law inconsistent with existing law." *State ex rel. Quintana v. Schnedar*, 115 N.M. 573, 575, 855 P.2d 562, 564 (1993). This Court harmonized the Gross Receipts and Compensating Tax Act with the Bingo Act in *Quantum Corp.*, 1998–NMCA–050, ¶¶ 14–21, 125 N.M. 49, 956 P.2d 848, and we have no difficulty similarly harmonizing the two codes in this case. Because the Nation's private elk herd is considered livestock for purposes of the disease eradication and other provisions of the Livestock Code, we see no reasonable basis for considering the herd to be anything other than livestock for purposes of the Code.

■ {34} Determining that the private elk herd is properly classified as livestock does not end the inquiry into whether the Nation's property is used primarily for agricultural purposes because the private herd utilizes only 6400 acres of the 27,040.8–acre tract at issue. In addition to the private elk here, there is a herd of wild elk, which we refer to as the public herd, that grazes the remaining portion of the disputed property, referred to as the "upland" portion. All of the Ranch, including this upland portion of the property, is utilized consistent with the Nation's conservation agreement with the USDA. The Nation acknowledges that the primary purpose of the land management strategies contemplated by this agreement is "to promote the vitality of the wild elk herd grazing on the Property, to maximize the income from elk harvest permits, and thereby compensate the corporation for its production of natural forage for the wild herd."

{35} By the same analysis we employed with respect to the private elk herd, we hold that the public elk herd, which utilizes the Nation's property and for which the Nation sells hunting permits and guide services, cannot be classified as livestock because the elk in that herd do not constitute "other domestic animals useful to man." The public herd is not domestic or domesticated, and the Nation does not engage in any breeding programs with respect to that herd. The question then becomes whether the Nation's USDA agreement can be deemed primary agricultural use.

### The Soil Conservation Program

■ {36} Although the Assessor conceded that the USDA agreement was a bona fide agricultural use of the property, the Board did not agree. The Board found that the USDA agreement did not qualify as a "soil conservation program" as that term is used in Section 7–36–20(B) because the agreement "has, as its primary purpose, the development and maintenance of a habitat suitable for the maintenance of elk, not soil conservation."

{37} Section 7–36–20(B) provides:

For the purpose of this section, "agricultural use" . . . includes the use of land that meets the requirements for payment or other compensation pursuant to a soil conservation program under an agreement with an agency of the federal government.

Thus, in order to be an agricultural use under this definition, an agreement with a federal agency must qualify for compensation and must be pursuant to a soil conservation program. *See High Ridge Hinkle Joint Venture*, 1998–NMSC–050, ¶ 5, 126 N.M. 413, 970 P.2d 599 (stating that language of statute is to be given its ordinary meaning unless legislature indicates a contrary intent).

{38} The Nation's agreement with the USDA was part of that agency's Environmental Quality Incentives Program (EQIP). *See* 16 U.S.C. § 590h(b)(1) (2003); 16 U.S.C. §§ 3839aa to –9 (2003). As such, the agreement met the requirements of Section 7–36–20(B). First, the agreement provided for compensation in the form of cost-sharing. Second, the agreement is pursuant to a soil conservation program. Although the information in the record refers variously to "resources conservation" and "soil conservation," it is apparent that the agreement substantively results in conservation of the soil as well as other resources. For example, the agreement requires the Nation to manage irrigation water to "minimize soil erosion" and to manage pasture and hayland "to maintain enough cover to

protect the soil." (Emphasis deleted.) Moreover, it appears that several of the federal government's soil conservation programs for agricultural use fall within the purview of the broad EQIP. Consequently, certain soil conservation agreements with federal agencies will necessarily be part of an EQIP agreement encompassing natural resources in addition to soil, rather than a conservation agreement strictly restricted to soil. Therefore, we hold that the Nation's EQIP agreement with the USDA qualifies as a soil conservation program, which is a bona fide agricultural use under Section 7–36–20(B).

{39} The next question is whether the Nation's EQIP agreement constitutes primary use of the disputed property. *Alexander*, 1999–NMCA–021, ¶ 11, 126 N.M. 632, 973 P.2d 884. The Department's regulation, 3 NMAC 6.5.27, persuades us that it is. 3 NMAC 6.5.27(A) provides:

(1) When applying for classification of land as land used primarily for agricultural purposes, the owner of the land bears the burden of demonstrating that the use of the land is primarily agricultural. This burden cannot be met without submitting objective evidence that:

(a) the plants, crops, trees, forest products, orchard crops, livestock, poultry or fish which were produced or which were attempted to be produced through use of the land were:

(i) produced for sale or home consumption in whole or in part; or

(ii) used by others for sale or resale; or

(iii) used, as feed, seed or breeding stock, to produce other such products which other products were to be held for sale or home consumption; or

(b) the use of the land met the requirements for payment or other compensation pursuant to a soil conservation program under an agreement with an agency of the federal government; or

(c) the owner of the land was resting the land to maintain its capacity to produce such products in subsequent years.

Although this regulation states that the burden of proof is on the taxpayer, which was the scheme before Section 7–36–20 was amended in 1997, the regulation's definition of primary agricultural use is still applicable. The regulation sets out three alternative circumstances that will qualify property for primary agricultural use: (1) land on which certain agricultural products were produced or attempted to be produced with the intent that they be sold, consumed at home, used by others for sale, or used to produce other agricultural products; (2) land meeting the requirements for a conservation program under an agreement with a federal agency; or (3) land being left fallow to maintain its capacity to produce agricultural products. Because each option is separated by the disjunctive "or," we conclude that any one of the three alternatives qualifies the land for primary agricultural use. *See Hale v. Basin Motor Co.*, 110 N.M. 314, 318, 795 P.2d 1006, 1010 (1990) (stating that " 'or' should be given its normal disjunctive meaning unless the context of a statute demands otherwise"); *N.M. Dep't of Health v. Ulibarri*, 115 N.M. 413, 416, 852 P.2d 686, 689 (Ct.App.1993) ("We construe administrative agency rules in the same manner as we interpret statutes."). Consequently, the Nation's use of the disputed property pursuant to its EQIP agreement with the USDA qualifies as "primary agricultural use" under the regulation.

{40} The Board concluded that the EQIP agreement could not qualify as primary agricultural use because the Nation's primary purpose in carrying out the agreement was to develop habitat for the wild herd. An examination of the regulation's provisions regarding the various agricultural uses recognized by Section 7–36–20 reveals that the Board's conclusion rests on an erroneous interpretation of 3 NMAC 6.5.27. *Cf. High Ridge Hinkle Joint Venture v. City of Albuquerque*, 119 N.M. 29, 38, 888 P.2d 475, 484 (Ct.App.1994) (explaining that reviewing court does not consider or defer to agency's interpretation of agency-enacted code unless the code is ambiguous). With respect to the agricultural uses set forth in Section 7–36–20(B) that involve "the production of plants, crops, trees, forest products, orchard crops, livestock, poultry [and] fish," the regulation

clarifies that these uses will be deemed primary only if the specified items are "produced for sale or home consumption," "used by others for sale or resale," or "used, as feed, seed or breeding stock, to produce other such products which other products were to be held for sale or home consumption." 3 NMAC 6.5.27(A)(1)(a); *see also Alexander*, 1999-NMCA-021, ¶ 16, 126 N.M. 632, 973 P.2d 884 (holding that the regulation provides a reasonable method for determining whether a purported agricultural use is the primary use of the property). By contrast, with respect to the other agricultural use set forth in Section 7-36-20(B) at issue here— "meet[ing] the requirements for payment or other compensation pursuant to a soil conservation program under an agreement with an agency of the federal government"—the regulation adds no further requirements necessary to qualify such use as primary. 3 NMAC 6.5.27(A)(1)(b). Thus, we conclude that if a taxpayer's primary use of property meets the requirements for compensation under a federal soil conservation agreement, and if the taxpayer has actually entered into such an agreement, then the taxpayer's use will be deemed to be primarily agricultural. We suggested this interpretation of the regulation in *Alexander*, 1999-NMCA-021, ¶¶ 31-32, 126 N.M. 632, 973 P.2d 884, when we held that a taxpayer's land was not primarily used for agricultural purposes because, among other reasons, he did not prove that he had entered into a soil conservation agreement even though he qualified for such an agreement.

{41} The record establishes that the Nation's use of the upland property for wild elk habitat met the requirements for compensation under the EQIP agreement with the USDA. The district conservationist for the USDA's Natural Resources Conservation Service wrote a letter stating that the Nation "has in effect an approved conservation plan and cost-sharing contract" and that the Ranch qualified for the program "because the land is used to produce livestock or other animals such as wildlife for food or fiber." Pursuant to 3 NMAC 6.5.27(A)(1)(b), the Nation's qualification for compensation under this agreement constituted primary agricul-

tural use of the upland portion of the property.

{42} We conclude that the plain meaning of Section 7-36-20 and the regulations promulgated under that statute compel the conclusion that the disputed land is utilized primarily for agricultural purposes. The Board's contrary conclusion resulted from an erroneous interpretation of the law. We therefore reverse the Board's affirmance of the Assessor's amended notice of valuation.

## CONCLUSION

{43} For the foregoing reasons, we reverse the Board's determination affirming the Assessor's amended notice of valuation and remand to the Board for proceedings consistent with this opinion.

{44} **IT IS SO ORDERED.**

WE CONCUR: MICHAEL D. BUSTAMANTE and CELIA FOY CASTILLO, Judges.